## ATTORNEY GENERAL *vs.* NEW YORK, NEW HAVEN, AND HARTFORD RAILROAD COMPANY.

Suffolk.    April 18, 1908. — May 8, 1908.

Present: KNOWLTON, C. J., LORING, BRALEY, SHELDON, & RUGG, JJ.

*New York, New Haven, and Hartford Railroad Company. Corporation,* Chartered also in other State, *Ultra vires. Railroad. Equity Jurisdiction,* To restrain unauthorized act of corporation. *Words,* "Take or hold," "Indirectly."

The New York, New Haven, and Hartford Railroad Company, created by charters from this Commonwealth and from the State of Connecticut, operating a railroad extending into both States, having the same capital stock to cover its property in both States and electing its officers and managing its business as a single corporation, is a domestic corporation in each of the States and cannot exercise in Massachusetts powers given to it only by its Connecticut charter which other corporations in Massachusetts are not permitted to exercise.

Section 6 of St. 1844, c. 28, under which the Hartford and Springfield Railroad Corporation, a Massachusetts corporation, was united with the Hartford and New Haven Railroad Company, a Connecticut corporation, under the name of the New Haven and Springfield Railroad Company, provides that " the said corporation, so far as their road is situated in Massachusetts, shall be subject to the general laws of this State to the same extent as if their road were wholly therein," and the provision of § 2 of the same chapter that after the two corporations have become united "all the tolls, franchises, rights, powers, privileges, and property granted or to be granted, acquired, or to be acquired, under the authority of the State of Connecticut, or of this State, shall be held and enjoyed by all the stockholders, in proportion to their number of shares, in either or both of said corporations," did not give to the corporation then formed, and does not give to the New York, New Haven, and Hartford Railroad Company as its suc-

cessor, the right to receive from the State of Connecticut any franchise to be enjoyed or exercised in Massachusetts in violation of the laws or public policy of this Commonwealth.

The New York, New Haven, and Hartford Railroad Company is subject to the prohibition contained in St. 1906, c. 463, Part II. § 57, that " a railroad corporation, unless authorized by the General Court or by the provisions of the following five sections, shall not directly or indirectly subscribe for, take or hold the stock or bonds of or guarantee the bonds or dividends of any other corporation."

In the prohibition contained in St. 1906, c. 463, Part II. § 57, that " a railroad corporation, unless authorized by the General Court or by the provisions of the following five sections, shall not directly or indirectly subscribe for, take or hold the stock or bonds of or guarantee the bonds or dividends of any other corporation, the words " subscribe for, take or hold " include legal ownership of every kind and the word " indirectly " covers modes of holding other than by taking or holding the legal title, so that the words together cover every kind of proprietary interest in the stock or bonds referred to, and it is immaterial how or where the legal title is held directly, if indirectly the railroad corporation is the equitable or beneficial owner.

On an information filed by the Attorney General under St. 1906, c. 372, against the New York, New Haven, and Hartford Railroad Company to restrain it by injunction from directly or indirectly subscribing for, taking or holding the stock or bonds or guaranteeing the bonds or dividends of certain street railway companies without authority of law, it was *held*, on facts reported by a master, that the lines of all the street railway companies mentioned in the information were indirectly held, controlled and managed in the interest of the defendant, and, that, as an injunction must issue to terminate such holdings, it was not necessary to determine at this time whether on the facts reported the defendant also was guaranteeing indirectly the dividends of the street railway companies named.

Upon an information filed by the Attorney General under St. 1906, c. 372, against a railroad corporation to restrain it by injunction from directly or indirectly subscribing for, taking or holding the stock or bonds or guaranteeing the bonds or dividends of certain street railway companies without authority of law, it would not help the defendant if it could show that some other railroad corporation openly had acted *ultra vires* without prosecution by officers of the Commonwealth.

Directly or indirectly subscribing for, taking or holding the stock or bonds or guaranteeing the bonds or dividends of another corporation in this Commonwealth, by a railroad corporation organized under our laws, without authority under its charter or the statutes of the Commonwealth, is the exercise of what would ·be a franchise if authority to do such acts had been granted by the Legislature, and may be restrained by injunction under St. 1906, c. 372.

INFORMATION IN EQUITY, filed on October 3, 1906, by the Attorney General at the relation of the commissioner of corporations, under St. 1906, c. 372, § 1, which provides that " upon an information in equity in the name of the attorney-general, at the relation of the commissioner of corporations, the Supreme Judicial Court shall have power to restrain by injunction any corpo-

ration from assuming or exercising any franchise or privilege or transacting any kind of business not authorized by the charter of such corporation and the laws of this Commonwealth."

The information in substance alleged that the New York, New Haven, and Hartford Railroad Company is a corporation organized under the laws of this Commonwealth for the purpose, among others, of owning and operating a railroad therein, having a usual place of business in Boston ; and that such corporation has directly and indirectly subscribed for, taken and held the stock and bonds and has guaranteed the bonds and dividends and is now directly and indirectly holding the stock and bonds and is guaranteeing the bonds and dividends of certain domestic corporations, all of which are street railway companies incorporated under the laws of this Commonwealth ; and that the stock and bonds held and the bonds and dividends guaranteed by such railroad company are so held and guaranteed without authority from the General Court of the Commonwealth and without authority under any law thereof ; and that the defendant now owns and is operating the roads and properties of those domestic street railway companies ; that by these acts the defendant has assumed and exercised and is assuming and exercising a franchise and privilege, and has transacted and is transacting a kind of business not authorized by its charter or by the laws of this Commonwealth.

The case came on to be heard before *Rugg,* J., who reserved it upon the pleadings, a master's report, including the evidence therewith reported, an interlocutory decree confirming the master's report, and the appeal of the informant, for determination by the full court, such decree to be entered as equity and justice might require.

*D. Malone,* Attorney General, (*F. B. Greenhalge,* Assistant Attorney General with him,) for the plaintiff.

*J. H. Benton,* (*C. F. Choate, Jr.,* with him,) for the defendant.

KNOWLTON, C. J. In the St. 1906, c. 463, Part II. § 57, is the following provision : " A railroad corporation, unless authorized by the general court or by the provisions of the following five sections, shall not directly or indirectly subscribe for, take or hold the stock or bonds of or guarantee the bonds or dividends of any other corporation." This is a re-enactment of a statute

that has been in force since 1874.   Then follows a limitation upon the amount of bonds that may be subscribed for and held or guaranteed under the authority above referred to.   The following five sections authorize the holding of stock in a telegraph company whose lines connect two or more places on the railroad, the guaranteeing of bonds of a corporation incorporated in Massachusetts for the purpose of carrying freight, passengers and mails between any port of this Commonwealth and Europe, the taking of stock in any elevator corporation organized for the purpose of erecting and operating a grain elevator within this Commonwealth, the guaranteeing of bonds of connecting railroads and aiding in the construction of any branch or connecting railroad within the limits of the Commonwealth, and, for that purpose, the taking of stock in such a corporation.

The provision above quoted is an affirmative statement of the doctrine of *ultra vires*, in reference to the stock or bonds of other corporations.   It carries this prohibition into a field which otherwise, in individual cases and under peculiar conditions, possibly might seem to be open for occupation by a railroad corporation for the promotion, incidentally, of its corporate interests.   It is intended to relieve railroad corporations and others from any doubt as to proposed investments in the stock or bonds of other corporations, and as to the financial support of other corporations by guaranteeing their bonds or dividends.

By excepting action under the five following sections it recognizes a policy of the Commonwealth to promote, under general laws, the investing in stock or the guaranteeing of bonds in certain corporations whose business is closely connected with that of the railroad corporation, or incidental to it, and also the like investing or guaranteeing for the purpose of aiding a connecting railroad, either already constructed or about to be constructed. Besides the general law permitting investing in aid of connecting railroads under these limitations, the exception recognizes the power of the General Court, by further legislation, to authorize the holding of stock or bonds of other corporations, as such holding has often been authorized by special legislation in Massachusetts and in other States.

The Attorney General alleges that the defendant has violated this provision.   It therefore becomes necessary to consider the

statute more particularly, as well as the defendant's relations to it, and the conduct of the defendant referred to in the information. The statute refers to railroad corporations established under the authority of this Commonwealth and amenable to its laws. It does not include foreign corporations. The defendant corporation was established under an act of the Legislature of Massachusetts, and it succeeds to rights and liabilities, or has directly obtained rights and assumed liabilities, under numerous legislative acts of Massachusetts. It was also organized under a law of Connecticut, where most of its property is. Many laws affecting it have been enacted in Connecticut, and it contends that, under the authority of these laws, it could legally do all that the Attorney General complains of.

The first question to be considered is whether, by reason of the peculiarities of its organization as a corporation owning and operating a railroad extending into different States, and deriving power and authority from the legislation of different States, it is relieved from the prohibition of the statute. If, without considering other provisions of the charter from Massachusetts or of the charter from Connecticut, we look first at the facts that there was a consolidation of two corporations into a single corporation which was the creature of both States, operating a railroad extending into both, having the same capital stock to cover the property in both States, and electing its officers and managing its business as a single corporation, there is nothing that makes it any more a domestic corporation in one of the States than in the other. It is a foreign corporation in neither of them. It is a domestic corporation in each of them. It is a single corporation in most of its features. In other features it is two corporations acting together as one. It is a single corporation with two parents who live apart and act independently, each having absolute control in his own domain. It owes allegiance and is subject alike to each, and is dependent upon each alike for future favors. We are dealing now with a legislative consolidation, or merger, of two corporations, upon equal terms, which this was; and not with mere permission to a corporation of one State to enter another State and acquire property or franchises there.

The statutes relating to corporations owning lines of railroad running across the boundaries of States differ considerably in

their provisions.   The acts under which the defendant corporation assumed its present name were the St. 1872, c. 171, and Connecticut Public Acts, 1871, c. 129.   These provided for a consolidation of the Hartford and New Haven Railroad Company with the New York and New Haven Railroad Company.   The New York and New Haven Railroad Company was incorporated in 1844.   4 Private Laws of Connecticut, 1020.   The Hartford and New Haven Railroad Company was itself incorporated, in its later form, under the authority of St. 1844, c. 28, and the Resolve of Connecticut passed in 1845, (4 Private Laws of Connecticut, 967) whereby the Hartford and Springfield Railroad Company of Massachusetts and the Hartford and New Haven Railroad Company were united under the name of the New Haven, Hartford and Springfield Railroad Company.   See also 4 Private Laws of Connecticut, 900.   By the St. 1847, c. 244, the name of the corporation to be formed by the union was changed to the Hartford and New Haven Railroad Company, which was the name of a previously existing corporation owning a railroad extending from Hartford to New Haven, incorporated in 1833.   2 Private Laws of Connecticut, 1002.   There were several acts of the General Assembly of Connecticut in regard to the Hartford and Springfield Railroad Company of Connecticut, covering the years from 1835 to 1842, but this corporation was never organized.   The extension of the Hartford and New Haven Railroad Company and its union with the Hartford and Springfield Railroad Company were under the Resolve of 1845, already referred to.   The acts relative to the Hartford and Springfield Railroad Company of Connecticut may be found in 2 Private Laws of Connecticut, 1006 ; 4 ibid. 917–919, and in the Resolves and Private Acts of Connecticut, 1838, p. 47. These acts all provide for a union with a Massachusetts corporation, for the construction and operation of a railroad between Hartford and Springfield.

The Hartford and Springfield Railroad Company, which was consolidated with the Hartford and New Haven Railroad Company under the St. 1844, c. 28, was incorporated under St. 1839, c. 101, with the additional and amendatory acts, Sts. 1841, c. 72; 1845, c. 42, and 1847, c. 244.

Section 7 of the St. 1872, c. 171, under which the New York;

New Haven, and Hartford Railroad Company was organized, is as follows: "Said consolidated corporation shall, at all times, be subject to the Legislature of this state as to that portion of its road in this state, as heretofore; and shall be subject to the general laws of this state as to its whole road, so far as such laws may be applicable thereto." In § 5 is this clause: "Provided, however, that when a special duty or liability is imposed, or any special franchise, privilege or immunity is conferred on the corporation so merged by its charter, such duty or liability shall attach to and be discharged by, and such franchise, immunity or privilege be enjoyed by such consolidated corporation, so far as the same is applicable to the road and franchise of said merged corporation." The St. 1852, c. 87, is an act authorizing the Hartford and New Haven Railroad Company to increase its capital stock, and in reference to the authority of the corporation it contains this language: "Also, to make any lawful contract, and merge or make joint stock with any other railroad company owning a branch of said railroad, or any other connecting line without the limits of Massachusetts, in the same manner and to the same extent as may be authorized by the General Assembly of the State of Connecticut; and said company shall be subject to all the general laws of this Commonwealth to the same extent as if their railroad were wholly therein: provided, however, that nothing in this act shall be interpreted to confer the power to purchase, merge or make joint stock with the railroad of the New Haven and Northampton Company, known as the Canal Railroad." By the St. 1868, c. 355, that portion of the last act which gives authority " to make any lawful contract and merge or make joint stock with any other railroad company without the limits of this Commonwealth," was repealed; but the provision making the company subject to all the general laws of this Commonwealth has not been changed.

Section 6 of the St. 1844, c. 28, under which the union of the Hartford and Springfield Railroad Company with the Hartford and New Haven Railroad Company was formed, is as follows: "Said corporation, so far as their road is situated in Massachusetts, shall be subject to the general laws of this state to the same extent as if their road were wholly therein." Section 2 declares that, after the said corporations become united in one

corporation by an assenting vote of the stockholders, "all the tolls, franchises, rights, powers, privileges and property granted, or to be granted, acquired, or to be acquired, under the authority of the State of Connecticut, or of this State, shall be held and enjoyed by all the said stockholders, in proportion to their number of shares, in either or both of said corporations."

The defendant relies strongly upon this last language, and contends that under it the State of Connecticut could give the corporation franchises and powers, to be exercised in Massachusetts, which other corporations in Massachusetts are not permitted to exercise. We have already suggested that, apart from some such provision, when a corporation is made up of two consolidated corporations holding charters from different States in the way shown by the statutes referred to, the new corporation is to be treated as a domestic corporation in each State in reference to the laws of that State relating to its conduct there. The relations of such corporations to the State, under different statutory provisions, have been considered in many cases, most of which relate to the citizenship of the corporation in reference to jurisdiction in the federal courts. *Nashua & Lowell Railroad* v. *Boston & Lowell Railroad*, 136 U. S. 356, and cases cited. *Goodwin* v. *New York, New Haven, & Hartford Railroad*, 124 Fed. Rep. 358. In the first of these cases Mr. Justice Field said, speaking for the court: "By the general law railroad corporations created by two or more States, though joint in their interests, in the operation of their roads, in the issue of their stock, and in the division of their profits, so as practically to be a single corporation, do not lose their identity; and each one has its existence and its standing in the courts of the country, only by virtue of the legislation of the State by which it is created. The union of name, of officers, of business and of property does not change their distinctive character as separate corporations." p. 382. In the latter of these two cases, Judge Lowell considered the subject at length in a well reasoned opinion, with a review of the authorities. In *Muller* v. *Dows*, 94 U. S. 444, 447, the court said of a similar consolidation: "The two companies became one. But in the State of Iowa that one was an Iowa corporation existing under the laws of that State alone. The laws of Missouri had no operation in Iowa." The

Attorney General of Massachusetts, in an able opinion to the Legislature, given in 1894, said of this defendant corporation: "It grants and acquires property as one corporation. It has no machinery by which it can act in a dual capacity. So far as respects its charter, it is two corporations. As to its property, contracts and business it is one and indivisible. In short, to quote the words of the Ohio court above cited, (*Covington Bridge Co.* v. *Mayer*, 31 Ohio St. 317,) it is in fact 'a single corporation clothed with the powers of two corporations.'" 1 Opinions of Attorney General, 118, 134. He might have added, "with the liabilities of each of two corporations, under the laws of the States, respectively, from which they received their charters." The principle was applied in *Kingsbury* v. *Chapin*, 196 Mass. 533, where the court said: "In a sense, such a railroad corporation is a domestic corporation in each of the States where it is incorporated and owns and operates a railroad. We think that stock in such a corporation is 'property within the jurisdiction of the commonwealth' under the language of our statute authorizing taxation of collateral inheritance. R. L. c. 15, § 1. St. 1905, c. 470. St. 1906, c. 436. We think it is property within the jurisdiction of the commonwealth in a constitutional sense, such as to enable the state to subject it to taxation as against a non-resident owner." But it was held that, in making the assessment, the stock should be valued on the basis of representing only that portion of the property of the company which was situated within the Commonwealth. See also *Moody* v. *Shaw*, 173 Mass. 375, 378, in which it was said that, "whenever either State has an interest in distinguishing between the two franchises, it has a right to do so." See also *Railway Co.* v. *Whitton*, 13 Wall. 270; *Pennsylvania Railroad* v. *St. Louis, Alton & Terre Haute Railroad*, 118 U. S. 290; *Memphis Railroad* v. *Alabama*, 107 U. S. 581; *Goodwin* v. *New York, New Haven, & Hartford Railroad*, 124 Fed. Rep. 358.

Each of the statutes of Massachusetts under which the defendant claims its franchises was subject to alteration, modification or repeal, the St. 1872, c. 171, by the express provision contained in § 9, and the others by virtue of our general law on that subject, which has been in force since 1831. R. L. c. 109, § 3.

How far, by reason of the peculiar nature of the corporation, or by force of express provisions in the statutes, has Massachusetts given up its right of control of this corporation, or relieved it of the application of our general laws, and how far has it retained such control? As creating a corporation to build and operate a railroad in two different States, and by the language quoted from the St. 1844, c. 28, § 2, the Legislature recognized the fact that the corporation might have certain franchises, rights, powers, privileges and property, granted or acquired under the laws of only one of the two States. As to such rights and powers as pertain only to local matters, like the location of the railroad, the possession and management of real estate, the crossing of highways and other railroads, the State in which they were to be exercised would have exclusive jurisdiction. This fact is enough to show the reason for using the language relied on by the defendant. In regard to all such matters, the action of only one State would be appropriate and sufficient. How far this implied authority to grant powers and franchises without the co-operation of the sister State should be held to extend, it is unnecessary in this case to decide. Whether it should go so far as to include the acquisition of other railroads within the State where the power is granted, or the location and construction of new lines and extensions there, and an increase of the capital stock for such purposes, is a question upon which it is not necessary to express an opinion.

Powers and franchises of a general character, whose effect upon the corporation would not be merely local, but would work changes in its relations to private persons and to the public authority in both States alike, stand differently. It is not easy to maintain that under these statutes there is implied authority to the corporation to receive such powers from either State alone and hold them in such a way that they will have full effect in both States. If any such general powers can be so granted and held without legislative action in both States, it seems plain that they are only such as are not in conflict with the laws or the declared public policy of the State which does not grant them. Massachusetts cannot grant this corporation franchises to be enjoyed and exercised in Connecticut, which are contrary to the laws of Connecticut; for the corporation in each State is

a domestic corporation, and as such it is governed by the laws of the State of its creation in all that it does within that State. We think it plain that, in the different provisions of the statutes of Massachusetts to which we have referred, the Legislature intended to retain control of the consolidated corporation as a domestic corporation in everything that it might do within this Commonwealth, and that, in recognizing its right to receive franchises and acquire property in Connecticut, it did not give it an implied right to receive any franchise in Connecticut to be enjoyed or exercised in Massachusetts in violation of the laws or public policy of this Commonwealth.

If we look more particularly at the language in § 2 of St. 1844, c. 28, relied on by the defendant, we see that its real purpose was not to give to either State greater power over the interstate corporation than the State would have without it. Its object was to declare that the corporation created by the merger of the Connecticut corporation and the Massachusetts corporation should have but one capital stock, and that all the stockholders, in proportion to the number of their shares, should own the stock and all rights of property in common.

Apart from this, the ownership of stock in street railways in Massachusetts is the exercise of a right under a Massachusetts franchise. This language was not intended to give to Connecticut authority to grant to the corporation a right to do in Massachusetts that which can be done only under a Massachusetts franchise.

It follows that, in reference to subscribing for, taking, or holding stock or bonds of corporations in Massachusetts, or guaranteeing the bonds or dividends of such corporations, the defendant is restrained by the statute, like other railroad corporations organized under the laws of this State.

Upon the question whether the defendant corporation has directly or indirectly subscribed for, taken and held the stock and bonds, and has guaranteed the bonds and dividends, and is now directly or indirectly holding the stock and bonds and guaranteeing the bonds and dividends of certain domestic corporations as alleged in the information, the master made a summary of facts found by him as follows:

"1. The directors of the New York, New Haven and Hart-

ford Railroad Company voted and took action upon the question of acquiring such street railways, and for that purpose acquired the stock and control of the Worcester and Connecticut Eastern Railway Company, which afterwards became the Consolidated Railway Company, which acquired additional powers from the General Assembly of Connecticut, and did acquire the stocks, bonds and securities of the street railways named in the information, excepting of the Springfield Street Railway Company.

" 2. The directors of the defendant corporation, holding the entire stock of the Consolidated Railway Company elected its directors and corporate officers, and the directors and officers so elected were substantially the same persons who were the corporate officers and directors of the New York, New Haven and Hartford Railroad Company.

" 3. The Consolidated Railway Company acquired all the stock of the Worcester and Southbridge Street Railway Company, the Worcester and Blackstone Valley Street Railway Company, the Webster and Dudley Street Railway Company, the Worcester and Webster Street Railway Company, and a majority of the capital stock of the Berkshire Street Railway Company. As holder of such stock it controlled the election of the directors and corporate officers of these street railway companies, and such directors and officers were substantially the same persons who were directors and officers of both the Consolidated Railway Company and of the New York, New Haven and Hartford Railroad Company.

" 4. The Consolidated Railway Company did not directly acquire a majority of the stock of the Springfield Street Railway Company, but it passed votes, acted and entered into agreements for the organization of the Springfield Railway Companies, and made an agreement with that association guarantying certain dividends on its preferred stock and guarantying a certain price upon the preferred stock in a certain event, and the Springfield Railway Companies did acquire a majority of the stock and securities of the Springfield Street Railway Company.

" 5. The officers and trustees of the Springfield Railway Companies are also persons who are directors and corporate officers of both the New York, New Haven and Hartford Railroad Company and of the Consolidated Railway Company.

" 6. The Springfield Railway Companies by its holding of stock of the Springfield Street Railway Company elects its directors and corporate officers, a majority of whom are directors and officers of the New York, New Haven and Hartford Railroad Company and of the Consolidated Railway Company.

" 7. The Consolidated Railway Company has continued to hold the entire capital stock of the Worcester and Webster Street Railway Company and of the Webster and Dudley Street Railway Company.

" 8. Upon June 25, 1906, the voluntary association known as the New England Investment and Security Company was formed, and the Consolidated Railway Company sold and conveyed to it all of the stocks, bonds, and securities which it held in the Worcester and Southbridge Street Railway Company, the Worcester and Blackstone Valley Street Railway Company, the Berkshire Street Railway Company, and the Springfield Street Railway Company (102 shares).

" 9. The plan of organization of the New England Investment and Security Company was reported to and approved by the directors of the New York, New Haven and Hartford Railroad Company, and an agreement as to the guaranty of its stock was made between the New York, New Haven and Hartford Railroad Company, the Consolidated Railway Company, and the New England Investment and Security Company; and the Consolidated Railway Company was a party to the agreement and declaration of trust.

" 10. Most of the trustees and officers of the New England Investment and Security Company are persons who are directors and officers of the New York, New Haven and Hartford Railroad Company and of the Consolidated Railway Company."

It is important to determine what is meant by the words, " shall not directly or indirectly subscribe for, take or hold the stock or bonds," etc. Doubtless one purpose of the provision was to protect minority stockholders from the risk of detrimental acts of a corporation *ultra vires.* But a more important purpose was to prevent a railroad corporation from obtaining, without legislative permission, the control of another corporation so situated that competition between the two might conserve the interests of the public. While combinations of connecting

railroads have been encouraged by many enactments, our laws are intended to prevent the consolidation of railroad corporations which are natural competitors for the same business, except when authority therefor is obtained from the Legislature. The words "subscribe for, take or hold," are intended to include legal ownership of every kind. The word "indirectly" covers other modes of holding than by taking or holding the legal title. The words together cover every kind of proprietary interest in the stock or bonds referred to. It is immaterial how or where the legal title is held directly, if, indirectly, the railroad corporation is the equitable or beneficial owner of it. What the Legislature was seeking to prevent was influence in the management of the subordinate corporation by the other corporation, however exercised, and whether extending to absolute control or falling short of it. With this in view, language was used in the statute to include every kind of beneficial ownership, however indirectly held.

The master's summary of facts and the other findings that appear in the report show how completely the defendant controls the street railways in question. The capital stock of all of them but the Springfield Street Railway Company was bought and held by the Consolidated Railway Company, all of whose stock is held by the defendant, and all of whose directors are the defendant's directors. If we assume that this corporation was legally organized and is legally maintained, so as to have a separate corporate existence, it is in reality a piece of legal machinery owned and operated by the defendant. Through this the defendant acquires and owns and uses property with as complete control as it has over its locomotive engines. If it does this indirectly, it does it as effectively as if the ownership were direct. Through the direct purchase and ownership of the street railway corporations, by its creature, the Consolidated Railway Company, the defendant transgressed the law as to all the street railway companies mentioned in the information, except the Springfield Street Railway Company, and is still transgressing in the same way as to the Worcester and Webster Street Railway Company and the Webster and Dudley Street Railway Company, whose ownership is retained in the same form. Some of these street railway companies have been

dealt with directly by the defendant, at different times, by votes of its directors while acting in that capacity. The defendant's president is the president of the Consolidated Railway Company and of all these street railway companies, and he receives no compensation for the performance of these official duties, except his salary as president of the defendant corporation.

The stock of the Springfield Street Railway Company was acquired through action of the Consolidated Railway Company, whose directors voted that it "should be acquired by this company, and that the plan for payment of the same, outlined by the president be approved, namely, the establishment of a trust covering the issue of $3,000,000 guaranteed trust certificates, and the sum of $1,500,000 of four per cent. debentures of this company." Here was the origin of the Springfield Railway Companies, which was established by the Consolidated Railway Company as a part of a scheme for holding and controlling the stock of the Springfield Street Railway Company. This is a voluntary association, consisting of a board of trustees, of whom all but one are directors of the Consolidated Railway Company and of the defendant corporation, who are designated as trustees in the declaration of trust, together with the members of the firm of Lee, Higginson and Company of Boston, bankers, who are called subscribers. Under the instrument the trustees assume no personal financial liability and have no beneficial ownership, although they are the holders of the legal title to all the property belonging to the association, and are the managers of it. Lee, Higginson and Company are parties for the purpose of disposing of preferred shares to be issued by the association, and managing other matters of finance. As a part of the arrangement, the Consolidated Railway Company entered into a contract with Lee, Higginson and Company which, after the formal part, began with a recital as follows : " Whereas, the Consolidated Railway Company desires to acquire the whole or at least a majority of the capital stock of the Springfield Street Railway Company, and desires Lee, Higginson and Company to offer to the stockholders of said company $225 in cash per share, or $75 in cash per share and $150 in preferred stock of the Springfield Railway Companies issued under a declaration of trust, dated March 15, 1905," etc. It was then agreed that the

Consolidated Railway Company should sell its four per cent fifty-year debentures to the amount of $1,500,000 and Lee, Higginson and Company should buy not exceeding that amount of these debentures at a price named, and should underwrite not exceeding $2,937,600 in amount of the preferred shares of the Springfield Railway Companies at $100 per share.    Then followed this recital, " which sale of bonds, with cash to be paid by the Consolidated Railway Company, and underwriting, will furnish the funds necessary for the purchase of said street railway stock at the price agreed upon," etc.    It was then agreed that the Consolidated Railway Company should forthwith issue, sell and deliver to Lee, Higginson and Company, the debentures, and that there should be " formed a holding trust to be called the Springfield Railway Companies . . . to acquire and hold the whole or at least a majority of the capital stock of the Springfield Street Railway Company ; which said trust shall issue at this time not exceeding $2,937,600 of preferred shares, which shall be entitled to cumulative dividends at the rate of four per cent. per annum, payable," etc. . . . . " and in case of liquidation, payment of the principal of said preferred shares at the rate of $105 per share, to be guaranteed by the Consolidated Railway Company, and to be subject to call on any dividend date at the rate of $105 per share, as provided in the agreement of said Consolidated Railway Company with the Springfield Railway Companies," etc. There was a provision that Lee, Higginson and Company should underwrite at par so many of the preferred shares as should be necessary to acquire the whole, or at least a majority of the stock of the Springfield Street Railway Company at the price stated. There was then a provision for an underwriting commission to be given to Lee, Higginson and Company in full payment for their services.    The expenses of forming the trust and of carrying out the terms of the agreement were to be paid by the Consolidated Railway Company.    Under this arrangement the stock of the Springfield Street Railway Company was acquired and turned over to the association, which consisted of the trustees, with no financial interest, and the Consolidated Railway Company, which was then the beneficial owner of all the property. The common shares in the Springfield Railway Companies to the amount of $5,000,000, were to be delivered to the Consoli-

dated Railway Company as soon as a majority of the stock of the Springfield Street Railway Company should be acquired. The proceeds of all the preferred shares were to be accounted for to the Consolidated Railway Company by Lee, Higginson and Company. The trust, including the accompanying contracts, was simply a machine, constructed for the management of the property and the business in the interest of the Consolidated Railway Company, which was the interest of the defendant corporation. As to sales made by Lee, Higginson and Company to third persons, and as to the underwriting of Lee, Higginson and Company if that be deemed a purchase by them of the preferred shares, the Consolidated Railway Company is still indirectly the owner of the shares, or at least of an interest in them. The Springfield Railway Companies is not a corporation, although the parties, by their contract, sought to obtain many of the advantages of a corporation without its liabilities. See *Hussey* v. *Arnold*, 185 Mass. 202. All who have any proprietary interest in it have rights of property as individual owners, subject to such restraints upon the management and use of it as are legally imposed by the contracts under which it is held. They are equitable tenants in common. By the terms of the agreement the association must be wound up and liquidated at the end of twenty years and eleven months. If there are profits from the enterprise, the Consolidated Railway Company will be entitled to the whole of them. It held all the common shares, although it has since turned them over to the New England Investment and Security Company. The other holders of the preferred shares can receive only $105 per share as principal, with interest at four per cent. Any proceeds beyond that amount will go to the Consolidated Railway Company. If there is not enough in the property to pay that, the Consolidated Railway Company must make up the deficiency; for it guaranteed this amount to all of the preferred shares on liquidation. It can at any time wind up the association; for by its contract it has retained a right to call and redeem all the preferred shares on any dividend date at $105 per share. The case is like that of an association that issues mortgage bonds to be redeemed at $105 at maturity, with a right to call and redeem them at any earlier time at the same rate. In such a case the

bondholders have merely made a loan. The real beneficial owners of the property are those who have agreed to pay the loan whereby the property will be redeemed. The transfer of certificates to purchasers of preferred shares is in the nature of a pledge. It seems plain that the Consolidated Railway Company is indirectly the holder and owner of everything belonging to the Springfield Railway Companies, subject to its relations to the New England Investment and Security Company to which we shall refer hereafter. As the defendant owns all the stock of the Consolidated Railway Company, it is indirectly the holder and owner of the 19,253 preferred shares of the Springfield Street Railway Company in the hands of the trustees of the Springfield Railway Companies, as well as of the right to redeem the preferred shares in the hands of purchasers.

The New England Investment and Security Company is a voluntary association similar to the Springfield Railway Companies, although in terms it is of broader scope as to the property that may be owned and the business that may be transacted. The declaration of trust by which it was created was signed by seven of the directors of the Consolidated Railway Company and of the defendant corporation, who were designated as the trustees, and by the Consolidated Railway Company, and by a member of the firm of Mackay and Company, bankers, who contracted to sell the preferred shares, and by an assistant of the president of the numerous corporations and the associations, who are designated together as subscribers. The trustees have no financial interest and are under no financial liability in regard to the property or business, but they hold the legal title and act as managers, under the name of the New England Investment and Security Company. They issued preferred shares and common shares which represent the ownership in the property and business of the association. The preferred shares are guaranteed by the Consolidated Railway Company, principal and interest, as the shares of the Springfield Railway Companies are, and are subject to call in the same way, and are to be redeemed at $105 per share when called, or when the affairs of the association are liquidated. This guaranty was made at the request of the defendant corporation, which in turn guaranteed the Consolidated Railway Company against loss from its guaranty. The Consol-

idated Railway Company sold to the New England Investment and Security Company all the stocks and bonds which it held of the Worcester and Southbridge Street Railway Company, the Worcester and Blackstone Valley Street Railway Company, the Worcester Railway and Investment Company, the Springfield Street Railway Company and the Springfield Railway Companies, for the sum of $10,000,000, which was paid by the promissory note of the New England Investment and Security Company, and it guaranteed the preferred shares of this company to the amount of $10,000,000, at the request of the defendant corporation. The contract under which the shares were issued and the guaranty was made, was signed only by the New England Investment and Security Company, the Consolidated Railway Company and the New York, New Haven and Hartford Railroad Company. In the last analysis, in view of the ownership of one corporation by the other, the only party that had any interest in the matters covered by the contract was the defendant corporation. There was a contract with Mackay and Company for the sale of these shares, but they were all held by Mackay and Company for the benefit of the Consolidated Railway Company. At the time of the hearing there were sixty-six thousand one hundred and thirty-seven preferred shares held by Mackay and Company and owned by the Railway Company. So far as relates to the questions with which we are now concerned, there is no substantial difference between the two voluntary associations. In each the equitable ownership is in the Consolidated Railway Company which is entitled ultimately to the profits from the management, if there are profits, on liquidation, and which must make good the loss to the preferred shareholders if there is a deficiency.

From the findings and evidence in the very voluminous report of the master, and notably from the testimony of Mr. Mellen, the president of the voluntary associations and the corporations, and of Harmer, the secretary and comptroller of the New England Investment and Security Company, it is plain that all the street railway companies mentioned in the information are indirectly held and controlled and managed in the interest of the defendant as absolutely and completely as it holds and manages its line of railroad between Springfield and New York. The allegations

of the Attorney General in this particular are fully sustained by the evidence.

The Attorney General contends that the defendant is directly or indirectly guaranteeing the bonds and dividends of these corporations. It is indirectly guaranteeing the dividends on the preferred shares of the two associations, — of the first association through the Consolidated Railway Company which it owns and controls, and of the second association in the same way, with an additional express guaranty to the Consolidated Railway Company for its protection from loss by its guaranty. These shares represent the ownership of the stock of these street railways. The guaranty is not of the dividends to be declared on the stock of the street railway corporations themselves, but only of the dividends to be declared on the shares of the holding company, issued to represent the stock in the corporations. Whether this should be deemed an indirect guaranty of the dividends of .the corporations, we do not deem it necessary at this time to determine, for it seems that, if the defendant ceases to hold directly or indirectly any proprietary interest in the stock of the street railway corporations, this will involve a termination of its relations as guarantor of these dividends.

The defendant's counsel has referred in his argument to returns of different railroad companies to the railroad commissioners at different times, showing a holding of stocks or bonds of other corporations. These were not in evidence, and the circumstances of the corporate action and the reasons for it do not appear. It is fair to assume, as the defendant's counsel did assume in his argument, that these holdings were, for the most part, if not altogether, under the authority of law. They show nothing more than that it has been a part of the policy of the Commonwealth to permit close relations between connecting railroads. Even if it should appear that some corporation had openly acted *ultra vires* without prosecution by the officers of the Commonwealth, it would not affect the construction of this statute or the right of the Commonwealth to enforce it. Action of a corporation *ultra vires*, where no great harm is done, often goes without rebuke.

The returns of the defendant are referred to, which show the holding of stocks in railroad companies in other states, and lately,

of certain railroad companies in this Commonwealth. We may assume that most, if not all of these, were stocks of connecting railroads, or were held under authority of special legislation in this State. Whether any of these holdings were in violation of the public policy of Massachusetts does not distinctly appear. Nothing is shown like the facts in the present case.

There was no unreasonable delay on the part of the public authorities in directing the attention of the defendant to the statute as soon as its conduct in Massachusetts in reference to these corporations became publicly known. The defense of laches cannot prevail.

Directly or indirectly subscribing for, taking and holding the stock or bonds or guaranteeing the bonds and dividends of another corporation in this Commonwealth, by a railroad corporation organized under our laws, is the exercise of that which would be a franchise if authority to do it had been granted by the Legislature. It is within the provision of the St. 1906, c. 372, and may be restrained by injunction under this statute. *Attorney General* v. *New York, New Haven, & Hartford Railroad,* 197 Mass. 194.

*Decree for the informant.*

NOTE. In pursuance of the rescript which accompanied the foregoing opinion, *Rugg,* J., on June 23, 1908, made the following decree:

" This case came on to be further heard after a rescript, and was argued by counsel, and thereupon, upon consideration thereof, and in accordance with said rescript, it appeared that, at the time of the filing of the master's report herein, the Worcester and Southbridge Street Railway Company, the Worcester and Blackstone Valley Street Railway Company, the Worcester and Webster Street Railway Company, the Webster and Dudley Street Railway Company, the Berkshire Street Railway Company, and the Springfield Street Railway Company, all being street railway corporations incorporated under and by virtue of the laws of this Commonwealth, and mentioned in the information, were, directly or indirectly, held, controlled and managed in the interests of the defendant, and that the capital stock of the said street railway companies was then, directly or indirectly, held by the defendant, and said cause having been reserved for the full court upon the entry of said master's report, and having been argued before the full court upon the same footing, and a rescript having been sent down upon the same footing, and nothing to the contrary having appeared up to the time of the sending down of said rescript,

" It is ordered, adjudged and decreed as follows:

"The defendant is, and its officers, directors, attorneys, agents and employees, respectively and collectively, are hereby enjoined and restrained —

"1. From subscribing for or taking, directly or indirectly, the capital stock of the Worcester and Southbridge Street Railway Company, the Worcester and Blackstone Valley Street Railway Company, the Worcester and Webster Street Railway Company, the Webster and Dudley Street Railway Company, the Berkshire Street Railway Company and the Springfield Street Railway Company, or either of them, all being street railway corporations incorporated under and by virtue of the laws of this Commonwealth, and mentioned in the information.

"2. From assuming or exercising the franchise or privilege of subscribing for, or taking, directly or indirectly, the stock of said street railway corporations, or either of them.

"3. From holding, directly or indirectly, the stock of said street railway corporations, or either of them, after the first day of July, in the year nineteen hundred and nine.

"4. From assuming or exercising the franchise or privilege of holding, directly or indirectly, the stock of said street railway corporations, or either of them, after the first day of July, in the year nineteen hundred and nine.

"Provided, however, That nothing herein contained shall affect existing leases executed in accordance with the provisions of chapter 293 of the Acts of the year nineteen hundred and one of this Commonwealth.

"And it is further ordered that this decree be entered as of the eighth day of May, in the year nineteen hundred and eight.

"And it is further ordered that the Attorney General recover his costs taxed at $2,585.40 and there be execution therefor."