CLARENCE H. VENNER, Doing Business under the Name of C. H. VENNER & Co., as a Stockholder in Certain of the Defendant Railroad Companies, Suing in His Own Behalf and in Behalf of All Other Stockholders Similarly Situated, Who May Elect to Come in and Contribute to the Expenses of This Action, Appellant, *v.* NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY and Others, Respondents.

Second Department, April 5, 1917.

Railroads — suit to compel dissolution of consolidation of railroad corporations — alleged violation of Federal and State anti-trust laws — capacity to violate statute not accompanied by actual violation thereof— control of railroad companies prior to consolidation— merger to effect economy — parallel railroads serving divergent areas — parallelity of a portion only of an interstate railroad — scope of Federal anti-trust laws — no presumption that railroads will violate statute in absence of evidence — Sherman Act — Clayton Act — control of railroad corporation by ownership of stock thereof — when stockholder cannot sue under Federal statutes — proof necessary to injunctive relief — control of railroads acquired before enactment of anti-trust laws — failure of individual stockholder to show personal damage — respective jurisdiction of Federal and State courts — extent to which State courts will enforce anti-trust laws of other States — estoppel of stockholder who has accepted benefits of railroad control — laches — consolidation of lines not formerly connecting — anti-trust laws not retroactive — effect of approval of combination by Railroad Commissioners, etc. — effect of State laws upon interstate railroads — combination of parallel railroads which are both necessary to handling actual traffic — right of railroad corporation to hold stock of terminal company— limitation of action — costs — additional allowance.

Suit in equity brought against the New York Central Railroad Company, incorporated in 1913, and other railroad companies, to compel a dissolution of a consolidation between them, perfected December 23, 1914, pursuant to an agreement made in March, 1913, which suit is based on the theory that the combination is illegal and in violation of the so-called Sherman Act, the Clayton Act and the statutes of the State of New York and the statutes of the various other States in which said railroads operate which forbid combinations in restraint of trade or designed to stifle competition. The defendant New York Central and Hudson River Railroad Company by such combination succeeded to the property rights of the constituent companies, including the capital stock which said companies own, and through such stock ownership elects the

directors of the constituent companies and fashions their policy. The plaintiff sues as a stockholder of the New York Central Company, and of certain of the constituent and controlled companies, on his own behalf and on behalf of all other stockholders similarly situated who may elect to come in and contribute to the expenses of the action. Evidence examined, and *held,* that the combination and consolidation complained of are not in violation of the Federal statutes aforesaid, nor in violation of the statutes of the State of New York or of the statutes of other States, in so far as the courts of this State have jurisdiction to enforce said foreign statutes.

The Federal anti-trust laws and similar statutes of the various States are not offended by the mere naked capacity of a railroad company which has acquired the ownership of railroad lines which are, to some extent, parallel, to injure perversely one of said lines to the advantage of the other. In order to make out a violation of said acts there must be evidence of an illegal purpose or interest with consequent injury to stockholders, creditors and to the public.

Thus, where, as a matter of fact, a railroad company for many years has exercised power over other railroad companies by the ownership of their stock, and by the identity of a majority of directors, and has in the past done no acts in violation of the statutes aforesaid, a subsequent consolidation of said railroad interests for the purpose of furnishing a more convenient instrumentality for operating the lines previously controlled, and designed to effect economy in said management, will not be declared illegal by a court of equity in the absence of proof that the technical form of management brought about by the consolidation tends to restrain trade or commerce, or stifle competition. A new intention to violate said statutes cannot be ascribed to the merger if the result thereof is the same as under the previous conditions, as to which there has been no complaint.

Although two of the consolidated railroads, one running to the north and the other to the south of Lake Erie, have terminals at the cities of Buffalo and Chicago, and to a certain extent may be considered parallel and competing lines, the unity of control cannot be deemed to be in violation of the statutes aforesaid when one of the companies' acts as a feeder and outlet to and from the vast territory of the United States and Canada to the north of Lake Erie, while the other serves the same purpose respecting large territories to the south of said lake, for the physical situation shows that they reach disassociated fields of service, so that there could be no intention to cripple one railroad for the advantage of the other.

Where railroads after a combination pass through several States they should be considered as one system, and a mere portion of said roads which may run parallel should not be dissevered from the system for the purpose of determining that the unified control of the parallel portions is hostile to the Federal and State anti-trust laws. If two lines serve quite unrelated neighborhoods the parallelity of a portion thereof may be considered to be inconsequential.

Second Department, April, 1917.                [Vol. 177.

An undue restraint upon the operation of two railroad lines cannot be predicated upon the mere fact that both of them connect with other lines of a common system, or with lines of other companies, whereby varied opportunities for dispatching freight and passengers are afforded, if the lines are apart in distance and foreign to each other in the province of their business.

The Federal anti-trust laws deal with travel between States and nations, not between localities in the same State or small localities near boundary lines to which both roads may be available as ways, and there is no offense to said Federal statutes because portions of said lines may parallel each other within narrow zones before they diverge.

It is not to be presumed that a railroad company which has acquired control of two parallel lines within a State will use its power to destroy one of them to the advantage of the other, where there is nothing to show that the capacity of both lines is not necessary to the adequate handling of traffic common to the localities between which they run parallel.

In the absence of such evidence the court will not conclude that the unity of control was brought about for an illegal purpose.

The Federal statute (Sherman Act) analyzed and decisions relating thereto collated and discussed, and *held*, that the combination of railroads attacked by the plaintiff in the present action does not offend said Federal statute.

A combination of railroads brought about through the ownership of the stock of one railroad company by another railroad company may be an illegal combination within the prohibition of the Federal statute.

Under the Federal decisions interpreting the Sherman Act the present plaintiff has no authority to maintain this action to dissolve the alleged illegal combination of railroads aforesaid.

Moreover, the Clayton Act, so called, providing that any person or corporation may sue for injunctive relief in Federal courts having jurisdiction of the parties against threatened loss or damage by a violation of the anti-trust laws, when under the same conditions injunctive relief against threatened conduct which will cause loss or damage is granted by courts of equity, on showing danger of immediate irreparable loss or damage, does not authorize the plaintiff to maintain the present action, because: *First*, he has not proved damage as required by said act; *second*, because by his long participation in the enjoyment of the stock-holding by the former New York Central Railroad Company he is precluded from alleging that it was illegal under either Federal acts or the law of any State; and *third*, because the Clayton Act does not authorize the plaintiff to file a bill to divest property acquired before it went into effect.

The Clayton Act does not allow a private individual to redress a violation of a statute merely because it is a violation of public law. To avail himself of said act he must prove that the violation of the statute "will cause loss or damage." He may have a preliminary injunction if he show that the "danger of irreparable loss or damage is immediate," but not if he merely show an offense against the United States.

Hence, as in the present case there is no proof of any damage whatever distinguishing the plaintiff from the mass of the people, he is not entitled to an injunction under the Clayton Act, which is not designed to vindicate public justice.

Moreover, the Clayton Act does not enable a stockholder to maintain an action in behalf of his corporation; he must show damage to himself.

The Sherman Act is a criminal statute and its enforcement as such falls to the Federal Government, although in general the State courts may maintain a civil suit based on a Federal statute provided they can gain jurisdiction of the proper parties, and this is true even though the Federal courts have jurisdiction. However, the Sherman Act and the Clayton Act related thereto, provide for their enforcement by the Federal courts and, such being the trend of decision, it is the duty of our court to abide thereby and hold that the State courts have no jurisdiction of the present action.

Anti-trust laws of the States of New York, Pennsylvania, Ohio, Indiana, Illinois and Michigan examined, and *held*, not to authorize the plaintiff to maintain the present action in the courts of this State as an individual stockholder suing on behalf of himself and other stockholders who may join in the action.

While as a general principle of the common law a railroad corporation cannot purchase the stock of another railroad corporation without express authority given by charter, such express authority is given to railroad corporations by section 52 of the Stock Corporation Law of this State.

As the former New York Central Railroad Company purchased and held the stocks of other railroad companies long prior to the present consolidation of which the plaintiff complains and as, during that period, the present plaintiff received and enjoyed all the benefits of said stockholding without repudiating the same, he was guilty of laches, which bars the maintenance of the present equitable suit brought for the purpose of dissolving the combination, for by the delay he has acquiesced in and ratified the transaction.

The preceding ruling would not apply as to *ultra vires*, fraudulent or illegal acts of directors of the corporation, for these, *it seems*, may be redressed even after long delay.

Although the statutes of various States in which the defendant railroads operate only allow the consolidation of connecting lines, the consolidation is not illegal because prior thereto certain of the lines consolidated did not connect, if in fact the instantaneous effect of the consolidation was to make them connecting lines.

The provisions of the Constitution and statutes of the State of Illinois requiring a majority of directors to be residents of said State are not retroactive and are inapplicable to the case at bar, which involves the rights of an interstate corporation organized prior to said constitutional amendment.

Where it appears that the Railroad Commissioners, or Public Utility Commissioners, in several foreign States have determined in proceedings to

which the present plaintiff was a party, that some of the consolidations complained of should be permitted, the determination indicates, to some degree, the approval of said sovereign States, but the decision is not *res adjudicata.*

The consolidation must comply with the laws of the several States in which the consolidated railroad companies were incorporated, and this court may inquire whether there has been compliance with the laws of the several States in which the new consolidated company is incorporated in so far as any illegality in this respect divests the present plaintiff of his property rights.

As the former New York Central Railroad Company has controlled the stock of the Lake Shore Company since 1882 and as the Lake Shore Company owned and voted the stock of the Nickel Plate road which ran parallel to the Lake Shore road, a consolidation which enables the New York Central Company to vote directly the stock of the Nickel Plate road as well as that of the Lake Shore is not illegal, nor may the plaintiff so long acquiescent in the holding of the stock of the Nickel Plate Company now ask that it be adjudged an illegal asset, if for aught that appears to the contrary the Nickel Plate road was necessary to multiply the tracks of the Lake Shore road for the purpose of handling its necessary and legitimate business.

The plaintiff in the present action cannot question the legal right of the newly-incorporated New York Central Company to hold the stocks of the New York, Chicago and St. Louis Company and the New York State Realty and Terminal Company and of the Western Transit Company, which stocks were formerly held by the old New York Central Company. This for the reasons before stated.

The fact that the former New York Central Company owned the stock of the New York State Realty Company, which it was authorized to do under the laws of this State, did not preclude it from consolidating with another company which could not hold said stock.

Each company entering into a consolidation is to be treated as a domestic corporation in each State in reference to the laws of that State relating to its conduct there; but as to its property, contracts and business it is one and indivisible.

If a foreign railroad corporation is also a corporation of this State, it may, in so far as it is a State corporation, hold stock of other companies even though it has not a similar ability under the laws of other States.

For the reasons before stated the plaintiff cannot question the right of the new New York Central Company to control, by the consolidation, the New York and Harlem Railroad Company and the West Shore Railroad Company and other corporations which the old New York Central Company previously controlled.

Moreover, it is not the intention of the Federal anti-trust laws to subvert titles which had vested before said acts were passed, for it is not to be assumed that Congress, by enacting said statutes, intended to strip persons of their property or to divest stockholders of rights incident to ownership.

The right of the plaintiff to maintain the present action is governed by the ten-year Statute of Limitations (Code Civ. Proc. § 388), which is applicable to every form of equitable action the limitation of which is not specifically prescribed, except in cases of a continuing right, etc.

Hence, as the former New York Central Railroad Company had acquired the control of certain other corporations more than ten years before the present suit was brought, the same is barred by said Statute of Limitations.

As the plaintiff alleged that he is damaged in a sum over $1,500,000, it was proper for the court, in dismissing the complaint, to grant the defendants an additional allowance.

APPEAL by the plaintiff, Clarence H. Venner, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Westchester on the 18th day of May, 1916, upon the decision of the court dismissing the complaint on the merits after a trial at the Westchester Special Term, and also from an order entered in said clerk's office on the 15th day of May, 1916, granting the defendants an extra allowance of $2,000.

*Elijah N. Zoline* [*William A. Ulman* with him on the brief], for the appellant.

*Walter C. Noyes* and *Albert H. Harris* [*Alexander S. Lyman* and *Charles C. Paulding* with them on the brief], for the respondents.

THOMAS, J.:

Under the name of the New York Central Railroad Company (incorporated April 16, 1913), there has been a consolidation of the New York Central and Hudson River Railroad Company, the Lake Shore and Michigan Southern Railway Company and nine other companies. Thus the city of New York is directly connected by railway with Chicago. But there are other terminals. Northerly and southerly of the line noted, in itself nearly 1,000 miles in length, stretches a vast territory of incalculable agricultural and mineral wealth, and containing industrial and commercial centers, Pittsburg, Columbus, Cincinnati, Indianapolis, St. Louis and others towards the south; while northerly are Ogdensburg, Ottawa, Montreal, Detroit, Grand Rapids and other notable places. To bring such regions and intermediate localities into mutual communication, and to afford facilities for transportation to

Second Department, April, 1917.          [Vol. 177.

distant destinations, many interpenetrating railways had been built and the control of some of them acquired by certain of the constituent companies entering into the consolidation. So railways, themselves, perchance, products of earlier unification, have finally become one system, whose principal arteries feed and are fed by many lines distributed in diverse directions. The due development of railways has resulted from such mergers. Nor does the prevailing thought concerning transportation question the benefit. Indeed, one cannot but know the evils to all concerned from the several ownerships of physically connecting lines, isolated in operation and segregated in control. I feel at liberty to state that the result of the experience of all classes of people using railways is that the possible scope in distance of a bill of lading or passenger ticket should be unlimited and in inverse ratio to the proximity and accessibility of a known and an accountable carrier. But it is to disrupt the consolidation (perfected December 23, 1914, pursuant to an agreement made in March, 1913) and to resolve it into its elements and even to reach further dissevering results that this action was brought on December 14, 1914. Considering only the elements actually united, such a disposition seems at variance with usual conceptions of public benefit and tends to reactionary conditions that would be regarded as detrimental to the necessities of transportation, and as well subversive of essential rights of property. But the plaintiff would look beyond the immediate contract of consolidation to matters that do not appear in it. The law places some constraint upon railway increment by combination of independent lines. The reasons for it, and the historic basis, are presented in *Standard Oil Co.* v. *United States* (221 U. S. 1), and by Mr. Justice HOLMES in *Northern Securities Co.* v. *United States* (193 id. 197). Without stopping here to note the learning on that subject, I go straight to the salient applications of it by the appellant.

## LINES ALLEGED TO BE COMBINED IN VIOLATION OF THE SHERMAN ACT.

The lines which plaintiff alleges are combined in violation of the Sherman Act are: (1) The Michigan Central (ninety per

cent of the stock owned by the former New York Central since 1898 and not directly consolidated); (2) The Lake Shore and Michigan Southern (organized under the laws of New York, Pennsylvania, Ohio, Indiana, Michigan and Illinois, ninety per cent of the stock owned by the former New York Central since 1898, directly consolidated); (3) New York, Chicago and St. Louis (known as the Nickel Plate; majority of stock held by the Lake Shore since 1882, not directly consolidated). They are deemed by the plaintiff as potentially parallel and competing because (a) each company has or had a line from Buffalo to Chicago, with several intervening common points; (b) the Lake Shore entering the consolidation controlled by stock ownership or by lease, or by both, (1) the Big Four system; (2) the Lake Erie and Western lines; (3) the Toledo and Ohio Central lines; (4) the Chicago, Indiana and Southern Company (in the consolidation), among themselves also alleged to be potentially parallel and competing in some respects. The appellant also urges that the railways in several instances are parallel and competing within some of the States, where they are and where the new company is organized. There is other criticism of the consolidation which will be noticed conveniently. Whatever may be said at present has no reference to the Nickel Plate, unless specially mentioned. Plaintiff has owned 170 shares of the stock of the Michigan Central since 1904, 300 shares of the former New York Central since March, 1907, and 75 other shares since January, 1910, and 5 shares of the Lake Shore since December 2, 1914. The New York Central Company will be called the New Company; the New York Central and Hudson River Railroad Company, the former New York Central, and the Lake Shore and Michigan Southern, the Lake Shore.

THE CONSOLIDATION IS MERELY A CHANGE IN THE FORM OF CONTROL AND DOES NOT IN ITSELF OFFEND THE FEDERAL ANTI-TRUST LAWS.

The New Company succeeds to the property rights of the constituent companies, including the capital stock which they owned. Through stock ownership it chooses the directors of the Michigan Central and thereby fashions its policy, and through such agency operates its railway, to the extent that

practical solidarity of ownership may make the will of stock-holders authoritative.   I understand that the appellant's argument is, that the New Company succeeds to a railway (Lake Shore) that is parallel to, and competitive with, the Michigan Central, and has an interest and ability not existing before to restrain competition, and to lessen to those who would use either line the benefit that would come if one stockholder did not control both lines, whereby plaintiff as a stockholder is damaged.   Of course, if the same person own company A and company B, he may, if he keep within the law, exalt one and depress the other.   So the New Company could starve or rob itself in either direction, and to do so would deprive the communities on the depressed line, as well as the public, of legal opportunities, although it is a rational reflection that one does not make a pigmy of what for his needs should be a giant, and that it is not a reasonable inference that the New Company would weaken the efficiency and earning quality of a great tributary to its system, even if a supervising government, Federal or State, were not ready to thwart or to penalize such an attempt.   Such ability to exalt or to depress portions of properties pertains to every owner of them.   But I understand, and later propose to show, that the anti-trust laws are not offended by mere naked capacity for perversion and self-injury, without any evidence of illegal purpose or interest, and where the several arms of transportation are congruous and serviceable growths, and where amputation of a limb would merely deform the body of the general system, with consequent injury to stockholders, creditors and the public.   The former New York Central could, before the consolidation, do what the present New Company can do now.   The latter can do no more.   The grasp was as firm and the exercise of the power as facile in one case as the other.   The majority of the directors of the New York Central, it is urged, were also a majority of the directors of the Lake Shore, the Michigan Central, the Nickel Plate, the Big Four, Lake Erie and Western, the Toledo and Ohio Central, New York and Harlem, and other companies, and the officers were practically identical.   In short, since 1898, when the stock of the Lake Shore and the Michigan Cen-

tral was acquired there has been but one control and one ruler. Even before that the Vanderbilt family, from 1878, controlled the Lake Shore and Michigan Central. The New Company may decrease expenses of operation, as the formalities of eleven separate organizations need not be maintained, but the unity of capacities, the coherence of the rights of ownership, the motives of action, the interests to be conserved, the ease of sway, as to the Lake Shore and Michigan Central, have not been changed. There is in the New Company no such perfected solidarity that obedience is compelled the more to the new master than to the former one. It is a new form of control, but the change is the merest formality. The law looks beyond the externals to the substance, but the present corporate appearance is but another aspect of the same reality. If there is now monopoly or restraint of trade, or potency for it, there was then. The holder of the stock could then proffer or withhold goods to the degree that it can now. It could discourage or stimulate traffic over one line or the other, if it may do so now. A court of equity should not make exteriors, in themselves impotent for harm, grounds of judgment. It is clear that the consolidation in its mere self is not *intended* to restrain trade or commerce, but to furnish a convenient instrumentality for operating the lines which one company had earlier controlled. The result is not to restrain trade, because the effect is the same as before the consolidation. If a corporation is doing what for many years it was doing in another form, at least a new *intention* in the act cannot be ascribed to it, and if the *result* of the new act is the same as under earlier conditions, the new act takes on no sinister complexion from the things done under it. I shall later show that the courts consider the past history, whether that shows intention or purpose to restrain competition and to monopolize, the result of the combination and the purpose with which it is continued.

THE SYSTEM OF TRANSPORTATION AS IT WAS AND IS DOES NOT OFFEND THE FEDERAL STATUTES.

The Michigan Central through the Canada Southern Company, which it leases, and trackage rights, and the Lake

Shore, severally, have terminals at Buffalo. Each has a terminal at Chicago. The distance between the terminals via the Lake Shore is 540 miles, by the Michigan Central 535 miles. Lake Erie separates the railways for its length of about 250 miles. Principal competing stations are said to be Toledo, in Ohio; Detroit, Grand Rapids, Lansing, Jackson, Kalamazoo, Hastings, Albion, Marshall, Ypsilanti and Monroe, in Michigan; South Bend, Gary, Michigan City and Indiana Harbor, in Indiana; none of which is common to the main lines, unless it be the three last near Chicago. The Michigan Company passes through Canada and to the north of Lake Erie to Detroit. The Lake Shore passes to the south of Lake Erie. The lines are at the greatest distance sixty miles apart. The two lines to Chicago run in the same general direction and each company would seek traffic at Buffalo and Chicago, as well as at some intermediate points. But in determining whether a combination of the two lines is in restraint of interstate or international commerce, it should be considered what each line was intended to do, and what is the breadth of its activities. No one can fail at once to see that an essential purpose of the Michigan Central was, and is, to gather the commerce on the northerly side of Lake Erie and from points between Detroit and Chicago, and that the purpose of the Lake Shore was, and is, to serve the territory southerly of the line of Lake Erie. But that statement is very narrow and deficient, for from Detroit and Jackson on the Michigan Central two lines extend to Bay City, where they unite and stretch up through the Peninsula of Michigan to Mackinaw City, where there is water connection with Canada. There are some other branches tending northward, notably to Grand Rapids, South Haven and Benton Harbor on Lake Michigan. The Lake Shore had or controlled lines from Grand Rapids, Woodbury, Lansing, Jackson and Detroit, in the State of Michigan, and also lines intermediate the Michigan Central and Lake Shore lines west of Lake Erie, and while they may contribute to the Lake Shore line proper, another purpose apparently is to furnish Michigan transportation to regions south and southwest of the Lake Shore line. The territory towards the northwest, increasing so amazingly in production, as well as the portion of Canada north of

Lake Erie, are given over to the enterprise and profit of the Michigan Central. On the other hand, an examination of the map shows that the Lake Shore, while operating a line from Buffalo to Chicago, had acquired control, through stock holding, leasing or otherwise, of lines embraced in, or entering into, the States of Michigan, Pennsylvania, Ohio, Indiana, Illinois, and elsewhere. In their large aspects the two enterprises, the Lake Shore and the Michigan Central, are entirely dissimilar, save in the fact that they both seek business at Buffalo and Chicago, and have some local points which they commonly reach, usually through branches. It should be noticed that through the whole tract containing the constituent lines and their dependencies, there is shown on the map in the record a fine network of railways, not owned or controlled by any constituent company. That would not *per se* excuse or palliate a violation of anti-trust laws, but it bears upon the tendency and intent of the action. Monopoly of trade between the States, or the States and Canada, by reason of the present combination, seems the merest chimera. The actuality of the consolidation is a vast system of transportation from the Atlantic seaboard to Buffalo and thence to points west, northwest and southwest. When the New York Central line ends at Buffalo, it begins the distribution of its traffic, not for Chicago alone, very important as that is, but elsewhere, as various connecting points are reached over wide and diverse areas that demand service. But the multiplicity of its lines and terminals and the liberality of its service are urged as an offense because in the course of supplying so many localities some of its lines touch or cross each other or have common terminals. The former New York Central reaching Buffalo wished to deliver on both sides of Lake Erie. Lines for that end would naturally be carried to Chicago. It sought to carry not only to and from Chicago, but to and from all the lateral territory, through which service lines are now laid. I conceive that it may not be desirable that a railway be limited to two terminals, but rather that it shall radiate, here and there diverging to touch and to serve and to be used by many localities. But to that end there must be main arteries ramified in branches, whereby passengers and

goods are brought nearer to points of departure or destination. What I would say is that the ensemble must be considered, and that the enterprise does not become in restraint of trade, or monopolistic, because two lines of the system are parallel and have two common terminals. The public is not injured by dissemination of branches. The shipper is not. The stockholder gains by the wider gathering of products for transportation. In my judgment, the consummation of the system, the entirety of control, considering the geographical distribution of service, is in harmony with sound principles of economics in railway transportation. For let it be kept in mind that there was no law that forbade the New York Central's multiplicity of terminals, and there was every reason for extending the great eastern line for the broadest disposition of traffic. It was for the advantage of the New York Central, and the interests of New York and other States, guarded so solicitously by Legislatures, that the products of Canada and the northwest should not find their way by rail and water route to the Gulf of St. Lawrence, nor was it desirable in the interest of western routes by land and by water that there should be such diversion. Nor was it less advantageous to the localities served that the ores and other products of the northwest should find routes to the iron furnaces of Pennsylvania, whence in turn would be received the output of that State and the bituminous coal of southern Ohio and West Virginia. While Chicago is an important point from Buffalo, and an expectant westerly terminal, so are St. Louis, Cincinnati, Columbus, Indianapolis; and there is no logical reason for a public policy that should declare that if a company has a terminal in Chicago, it should not have terminals in such other cities; or that, if it searched out and visited the northerly domains, it should keep clear of southerly regions; or that, if one branch sweeping southerly also went to Chicago, its northerly line must avoid that place as one of its destinations.

The Subsidiary Companies of the Lake Shore. The Lake Shore through stock ownership controlled several companies. The New Company has succeeded to that control. Does that preclude legal consolidation? The map shows the Lake Shore and its relations to its dependencies, as has been stated. It is evi-

dent that none of the dependent lines (except the Nickel Plate) parallel each other or the Lake Shore to Chicago. But the appeal requires that some lines, specially designated as competitive and illegally controlled by the New Company, be examined. The plaintiff's argument as to these lines relates both to interstate and to intrastate conditions. But the lines should be taken in their normal relations, without splitting them into parts as they pass through or into two or more States. Where there is a system, that should be considered, and not portions dissevered to support a claim of local and limited parallelity.

*The Lake Erie and Western and the Big Four.* The Lake Erie and Western (Lake Shore had majority of stock control since about 1900) has a line southwesterly from Sandusky to Muncie, whence it takes a more westerly course to Peoria, Ill., and is intersected by a branch starting at Indianapolis and running northerly to Michigan City on Lake Michigan, connecting with the main Lake Shore near that point. The Big Four system (Cleveland, Cincinnati, Chicago and St. Louis Railroad Company — Lake Shore held fifty-two per cent of the stock) southwesterly from Cleveland branches at Galion in Ohio. The more northerly member runs through Muncie, where it touches the Lake Erie and Western, through Indianapolis to East St. Louis, while the other branch from Galion extends through Columbus, Springfield, Dayton and Cincinnati, thence to Indianapolis, where it subdivides for extensions to Chicago and Peoria, the Peoria branch at Danville meeting a line from Cairo. There are several lines, interconnecting parts of the Big Four system, or making departures for outlying districts, for instance, from Sandusky to Springfield; from Jackson, Mich., to Franklin, O.; from Benton Harbor on Lake Michigan to Anderson, to Greensburg, Ind., thence to Louisville, Ky.; and from Springfield to Indianapolis. Some of the Lake Erie and Western lines have similar directions, and reach some common points. The salient fact is that they reach those points from dissociated fields of service. It is true that the Lake Erie and Western has a principal line from Sandusky to and through Muncie, and that the Big Four sends a branch from Sandusky to Springfield, but, although emanat-

ing from the same point, that is, Sandusky, the transportation purposes relate to quite different compass points.   There is also a rough parallelity to Muncie of the Big Four from Cleveland and the Lake Erie and Western from Sandusky. But shall not the cities of Columbus and Cincinnati have a line from Cleveland and thence to Peoria because Sandusky is connected with Muncie and Peoria?   And is it candid criticism that from Cleveland lines may not run to Indianapolis, St. Louis and Peoria because the Lake Erie and Western touch such lines at Muncie and Indianapolis?   It does not seem so to me.   At Peoria, as noted, the Lake Erie and Western and Big Four have a common westerly terminal, from which they diverge towards the east on entirely different missions. At some distance northerly of Peoria is Zearing, whence the Chicago, Indiana and Southern (in the consolidation; Lake Shore owned most of stock) operates a line to South Bend on the Lake Shore in Indiana.   The accusation is, as I understand, that within the State of Illinois such lines potentially compete with the two lines from Peoria, and that the two lines out of Peoria potentially compete with each other.   That is founded on the argument that geographical parallelity, however the lines may be serving quite unrelated neighborhoods, is forbidden.   Unless a line's scope of influence for transportation purposes is compassed by another line's sphere of operation, parallelity is remote and inconsequent.

*The Toledo and Ohio Central and the Big Four.*   The Toledo and Ohio Central (majority of stock acquired by Lake Shore in 1910) has two lines out of Toledo.   I will later comment on them under the head of Ohio laws; but note here that they unite at or near Thurston southeasterly from Columbus and then separate to make with the Zanesville and Western a loop at Corning, and from Corning the controlled line (Kanawha and Michigan) penetrates the bituminous coal fields of southern Ohio and West Virginia.   The Big Four operates a line from Jackson, Mich., which extends southerly through Savona to Franklin, where it joins the Big Four line from Cleveland to Cincinnati.   The appellant's argument is that such line from Bryan (on the main Lake Shore line) to Savona (on the line from Springfield to Indianapolis) is a parallel and compet-

ing line with the Toledo and Ohio Central (just above mentioned) through Columbus to Corning, and is illegal under the laws of Ohio. The distance between Toledo and Bryan on the Lake Shore line is given at fifty-four miles. It does not appear that either of the two lines just above mentioned in usual competition would directly take the trade of the intervening territory, while their obvious purposes are quite different. The Toledo and Ohio Central line, connecting at Toledo with the Lake Shore and Michigan Central lines from Detroit, is designed to reach Columbus and westerly and southwestly points, and finally the coal mines in southern Ohio and in West Virginia, while the Cincinnati and Northern (Big Four) is intended to connect Jackson in Michigan with Cincinnati, and of course other places through other arms of the service. I cannot conceive that there is undue restraint upon the operation of either, or that illegality arises from the fact that the two lines on their several ways connect with other lines of the common system, or with lines of other companies, whereby varied opportunities for dispatching freight and passengers are afforded. The lines are apart in distance and foreign to each other in the province of their business.

*Big Four, Jackson to Savona; Lake Erie and Western, Jackson to Muncie.* In this connection I notice the suggestion that the Big Four line from Jackson to Savona parallels the line (Lake Erie and Western, Lake Shore system) from Jackson to Muncie. Both lines do start from Jackson and gradually diverging meet the Big Four direct line from Cleveland to St. Louis, the Lake Erie at Muncie (where it connects with its own system), and the Big Four line at Ansonia, 40.1 miles further east. The distance from Jackson to Muncie I find to be 165.3 miles, from Jackson to Ansonia 151 miles. The Lake Shore could have managed the stock of the two companies so that each directory would stifle competition where the intervening zone (largely intrastate in Michigan) is so limited that each could draw from it, and could have adjusted the rates so that traffic between Jackson and the Cleveland and St. Louis route would have favored one of its properties. But such a view so depreciates probabilities that I do not entertain it. However, it brings the discussion acutely to the question earlier

Second Department, April, 1917.          [Vol. 177.

presented, whether two lines paralleled, and in this instance of a short length, naturally competing before they draw apart, can be commonly owned through stock control. I cannot believe that anti-trust statutes are so meticulous of monopoly as to condemn a general purpose lest it be dwarfed into a capacity and intention to injure intervening vicinities that may for a comparatively short distance use either line. The Federal statute has to do with travel between States and nations, not between villages in the same State, or small localities near the boundary lines, to which both roads for a ways are available, and States contemplate that diversities of service must bring lines into narrow zones as they go on their several ways.

*Lake Shore and Michigan Central between Detroit and Toledo.* I come back to the Michigan Central and the Lake Shore. Each had a line practically from Toledo to Detroit. The Lake Shore line (Detroit, Monroe and Toledo) is in the consolidation, and the Lake Shore owned most of the stock. They are short in mileage and close in location, and, as I understand, each is in the State of Michigan. They are parallel and so related as to be competing. The New Company can send over either all the freight that it will bear. If it can afford to let one be idle, may it render it moribund and make the other abound? How, then? By charging higher rates on one than the other? That would be contrary to law, if it owns both lines, and the appellant urges that there is a substantial ownership in each case. How, then, will its evil and destructive potentiality display itself? In what abnormities of dealing? By neglecting the roadbed, equipment and service of one line, and magnifying that of the other? Has not the Railroad Commission of Michigan power over that? I think that the era has come when there is, even in the case of railroad companies, a presumption against self-destruction, if for no other reason because the law does not permit it. But I am unwilling to leave the matter there. It is a matter of common knowledge that Detroit and Toledo are centers of industry and great seats of manufacture. It does not appear but that the two lines in all their availabilities are needed for their trade, but it is inferable that they are. There should be considered the traffic gathered from the Michigan Peninsula and Canada, and

routed to places, near and remote, southerly of the Lake Shore main line; for instance, to Pennsylvania would go minerals, and thence would go its coals, and from southern Ohio and West Virginia their bituminous products. In the absence of informing evidence the court should decline to conclude that the two links (between Detroit and Toledo), introducing to each other two such widespreading but interdepending regions, are theoretically in illegal combination because they have become a part of a system in which they are important conduits of circulation.

THE CONSOLIDATION OF THE CONSTITUENT COMPANIES DID NOT OFFEND THE FEDERAL STATUTES, AS JUDGED BY DECISIONS.

To this point I have discussed the conditions preceding the consolidation and their actual continuance, to show (1) that the consolidation in itself is not an act, or a combination or aught else that offends the Federal anti-trust laws; (2) that the relations that earlier existed would not violate that act, taking into consideration the growth of the system and the intention and purpose of it and its use. I would now test the accuracy of the conclusion by ascertaining the concrete things condemned, by using the decisions to depict what the criminal and mischievous acts were, what their manifestations of evil intentions were, what destruction they wrought, and by what characteristics they were adjudged to be bad and illegal. The Sherman Act, sections 1 and 2, of July 2, 1890 (26 U. S. Stat. at Large, 209, chap. 647), is as follows: "Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court. Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed

guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." In *Standard Oil Co.* v. *United States* (221 U. S. 1, 49) Mr. Chief Justice WHITE, after considering the text of the act and its " meaning in the light of the common law and the law of this country at the time of its adoption," concluded that " reason was the guide by which the provisions of the act were in every case interpreted," and that " it was intended that the standard of reason which had been applied at the common law and in this country in dealing with subjects of the character embraced by the statute, was intended to be the measure used for the purpose of determining whether in a given case a particular act had or had not brought about the wrong against which the statute provided." While that was written of the 1st section of the act, relating to " restraint of trade or commerce," the thought is extended to the 2d section, which relates to monopoly of " any part of the trade or commerce among the several States, or with foreign nations." The judicial mind should be amenable to that rule. But in no better way can its application be taught than by tracing the elements that have affected the minds of the justices who have in last resort applied the statute to particular cases. The volume of facts submitted to their consideration, and the painstaking analysis of them by the court, are very marked features of the decisions. The inquiry has been, what was the condition of the business before the alleged violation of the statute ? What did the parties do to change it ? What effect has their course of dealing had upon the rights of others ? How has it affected or threatened trade ? How does it tend to affect it ? In the *Standard Oil* case the violation of the act was found in the following language: " a. Because the unification of power and control over petroleum and its products which was the inevitable result of the combining in the New Jersey corporation by the increase of its stock and the transfer to it of the stocks of so many other corporations, aggregating so vast a capital, gives rise, in and of itself, in the absence of countervailing circumstances, to say the least, to the *prima*

*facie* presumption of intent and purpose to maintain the dominancy over the oil industry, not as a result of normal methods of industrial development, but by new means of combination which were resorted to in order that greater power might be added than would otherwise have arisen had normal methods been followed, the whole with the purpose of excluding others from the trade and thus centralizing in the combination a perpetual control of the movements of petroleum and its products in the channels of interstate commerce. b. Because the *prima facie* presumption of intent to restrain trade, to monopolize and to bring about monopolization result. ing from the act of expanding the stock of the New Jersey corporation and vesting it with such vast control of the oil industry, is made conclusive by considering, 1, the conduct of the persons or corporations who were mainly instrumental in bringing about the extension of power in the New Jersey corporation before the consummation of that result and prior to the formation of the trust agreements of 1879 and 1882; 2, by considering the proof as to what was done under those agreements and the acts which immediately preceded the vesting of power in the New Jersey corporation as well as by weighing the modes in which the power vested in that corporation has been exerted and the results which have arisen from it.   Recurring to the acts done by the individuals or corporations who were mainly instrumental in bringing about the expansion of the New Jersey corporation during the period prior to the formation of the trust agreements of 1879 and 1882, including those agreements, not for the purpose of weighing the substantial merit of the numerous charges of wrongdoing made during such period, but solely as an aid for discovering intent and purpose, we think no disinterested mind can survey the period in question without being irresistibly driven to the conclusion that the very genius for commercial development and organization which it would seem was manifested from the beginning soon begot an intent and purpose to exclude others which was frequently manifested by acts and dealings wholly inconsistent with the theory that they were made with the single conception of advancing the development of business power by usual methods, but which on the contrary necessarily involved the intent to

drive others from the field and to exclude them from their right
to trade and thus accomplish the mastery which was the end in
view." I do not regret the long quotation, as it masses the
thoughts that led to the conclusion that the New Jersey cor-
poration was a combination in restraint of trade and also "a
monopolization bringing about a perennial violation of the sec-
ond section" of the act. The attempt to restrain trade and
monopolize it was as wide as the continent, to be achieved
through the exclusion of others by abnormal methods, by driv-
ing men from occupations and by centralizing commerce
in one company, all by overmastering power. Where in the
present consolidation are such signs of transgression found?
There is a similarity in the vast capital. But it has aggre-
gated through the years in the evolution of great and useful
lines of travel with accretions opening up to a general system
of transportation new territory, with no ruins, but with pros-
perities. At least, the record shows nothing different. I turn
to *United States* v. *American Tobacco Co.* (221 U. S. 106).
The facts, summarized by the chief justice so conveniently for
the reader, may be contrasted with those in the present case.
The summary shows products at one time "marketed under
competitive conditions of a peculiarly advantageous nature,"
the organization of the American Tobacco Company in New
Jersey, the absorption in divers ways of the manufacture and
sale of tobacco, and its accessories in various forms, the forma-
tion of new corporations, the purchase and closing of many
competitive plants, until by manipulation piled on manipula-
tion the whole commerce seemingly was at the mercy of the
ever-outstretching influence and power of the combination.
But the matter can be pictured comprehensively only by the
following excerpt from the opinion: " Indeed, the history of the
combination is so replete with the doing of acts which it was
the obvious purpose of the statute to forbid, so demonstrative
of the existence from the beginning of a purpose to acquire
dominion and control of the tobacco trade, not by the mere
exertion of the ordinary right to contract and to trade, but by
methods devised in order to monopolize the trade by driving
competitors out of business, which were ruthlessly carried out
upon the assumption that to work upon the fears or play upon

the cupidity of competitors would make success possible. We say these conclusions are inevitable, not because of the vast amount of property aggregated by the combination, not because alone of the many corporations which the proof shows were united by resort to one device or another. Again, not alone because of the dominion and control over the tobacco trade which actually exists, but because we think the conclusion of wrongful purpose and illegal combination is overwhelmingly established by the following considerations: a. By the fact that the very first organization or combination was impelled by a previously existing fierce trade war, evidently inspired by one or more of the minds which brought about and became parties to that combination. b. Because, immediately after that combination and the increase of capital which followed, the acts which ensued justify the inference that the intention existed to use the power of the combination as a vantage ground to further monopolize the trade in tobacco by means of trade conflicts designed to injure others, either by driving competitors out of the business or compelling them to become parties to a combination — a purpose whose execution was illustrated by the plug war which ensued and its results, by the snuff war which followed and its results, and by the conflict which immediately followed the entry of the combination in England and the division of the world's business by the two foreign contracts which ensued. c. By the ever-present manifestation which is exhibited of a conscious wrongdoing by the form in which the various transactions were embodied from the beginning, ever changing but ever in substance the same. Now the organization of a new company, now the control exerted by the taking of stock in one or another or in several, so as to obscure the result actually attained, nevertheless uniform, in their manifestations of the purpose to restrain others and to monopolize and retain power in the hands of the few who, it would seem, from the beginning contemplated the mastery of the trade which practically followed. d. By the gradual absorption of control over all the elements essential to the successful manufacture of tobacco products, and placing such control in the hands of seemingly independent corporations serving as

perpetual barriers to the entry of others into the tobacco trade.    e. By persistent expenditure of millions upon millions of dollars in buying out plants, not for the purpose of utilizing them, but in order to close them up and render them useless for the purposes of trade.    f. By the constantly recurring stipulations, whose legality, isolatedly viewed, we are not considering, by which numbers of persons, whether manufacturers, stockholders or employés, were required to bind themselves, generally for long periods, not to compete in the future." Such was the use of the rule of reason in the *Tobacco* case.    The decision, neither in word or spirit, has contact with the case at bar.    There are two cases that deal directly with a combination respecting the same railways, *Pearsall* v. *Great Northern Railway* (161 U. S. 646), under the statutes of Minnesota, and *Northern Securities Co.* v. *United States* (193 id. 197), under the Federal anti-trust acts.    The combinations were dissimilar in form, but one in purpose, viz.: to place under one control the Great Northern Railway Company and the Northern Pacific Railway Company.    Each company had some 4,500 miles of railway in its system, stretching into or across the States of Wisconsin, Minnesota, North Dakota, Montana, Idaho, Washington and Oregon to the Pacific coast.    The eastern terminals of the Great Northern were St. Paul and Duluth, Minn., and Superior, Wis., and its western terminals Everett and Seattle in the State of Washington, and as stated in the second case, Portland in Oregon; while the Northern Pacific had its eastern terminals at St. Paul, Minn., and Ashland, Wis., and western terminals at Tacoma, in the State of Washington, and Portland in the State of Oregon.    The agreement attacked in the first case involved the sale of the Northern Pacific, the issuance of $100,000,000 or more of bonds guaranteed by the Great Northern, and of $100,000,000 of stock, one-half to be distributed to the stockholders of the Great Northern, or to some person or corporation as trustee for their use, with a provision for interchange of traffic at connecting points for places not common to the two lines and for profit sharing according to mileage.    It is noticeable (1) that the opinion suggests that a different question would be present if the agreement had been effected before

the Legislature of Minnesota amended the statute, for it is said, "It is possible that, if this arrangement had been actually made and carried into effect, before the acts forbidding the consolidation of parallel or competing lines had been passed, the rights of the parties thereto would have become vested, and could not be impaired by any subsequent act of the Legislature;" (2) that "the effect of this arrangement would be to practically consolidate the two systems, to operate 9,000 miles of railway under a single management, and to destroy any possible advantages the public might have through a competition between the two lines;" (3) that the arrangement was a plain violation of the acts of the State of Minnesota, "prohibiting railroad corporations from consolidating with, leasing or purchasing, or in any other way becoming the owner of, or controlling any other railroad corporation, or the stock, franchises or rights of property thereof, having a parallel or competing line." The court decided that "The consolidation of these two great corporations will unavoidably result in giving to the defendant a monopoly of all traffic in the northern half of the State of Minnesota, *as well as of all transcontinental traffic north of the line of the Union Pacific,* against which public regulations will be but a feeble protection." In the *Northern Securities* case the scheme was to vest in the Northern Securities Company sufficient stock to control the Great Northern and the Northern Pacific systems, and that was by the court, four justices dissenting, considered a violation of the Federal Anti-trust Act. It was decided that however the stock was acquired or held, it was to be used in suppressing competition between the companies. The two cases show a purpose to centralize in one corporation two systems not only parallel but furnishing the only service at intermediate points through an immense territory, systems which had the common purpose of connecting the Great Lakes and the Mississippi river with the Pacific Ocean. This attempt was to combine them arbitrarily, without any valid purpose, and without either railway fitting in conjunction. Two different things, made to be used apart, were forced into unnatural union. That was distortion. It is convenient to call attention to the fact that the Great Northern Company and the Northern

Pacific had gained control of the Burlington system of 8,000 miles in length, as the bill showed, "extending from St. Paul, in the State of Minnesota, where it connects with the Great Northern and Northern Pacific Railway systems, through the States of Minnesota, Wisconsin and Illinois, to Chicago, in the State of Illinois, and from these two cities through said States and through the States of Iowa, Missouri, Nebraska, Colorado, South Dakota, Wyoming and Montana, to Quincy, in the State of Illinois; to Burlington and Des Moines, in the State of Iowa; to St. Louis, Kansas City, and St. Joseph, in the State of Missouri; to Omaha and Lincoln, in the State of Nebraska; to Denver, in the State of Colorado; to *Cheyenne, in the State of Wyoming, and to Billings, in the State of Montana, where it again connects with the Northern Pacific Railway system,* these States lying west of Chicago and south of the States crossed by the Great Northern and Northern Pacific systems, and *constituting the territory occupied in part by what is known as the Union Pacific Railway system, which has been and is a parallel and competing system within said territory with the said Burlington system.*" The bill did not, as I understand, ask for the dissolution of the arrangement by which the Burlington system was obtained — in any case the combination was left intact, although the Burlington Company had, with the Great Northern and the Northern Pacific, a common eastern terminal at St. Paul, and after its sweep southerly joined the Northern Pacific at Cheyenne, *en route,* coming into competition with the Union Pacific. This brings the discussion to *United States* v. *Union Pacific R. R. Co.* (226 U. S. 61), reversing the judgment below (188 Fed. Rep. 102). The Union Pacific Railroad Company acquired by stock purchase what was deemed a dominating control in the Southern Pacific. The Union Pacific system proper extended from the Missouri river to the Pacific coast, that is, from Council Bluffs, Ia., to Ogden, Utah, a distance of 1,000 miles, with a branch from Kansas City, Mo., through Colorado to the main line at Cheyenne, while it owned the stock of the Oregon Short Line Railroad Company, which operated a railway from Granger, Wyo., on the main line, to Huntington, Oreg., whence a line to Portland was owned and operated by the Oregon Railroad

and Navigation Company, the stock of which was owned by
the Oregon Short Line.   The Oregon Railroad and Navigation
Company owned the boat line from Portland to San Francisco,
and to the Orient.   The Union Pacific had no railway line
from Ogden to San Francisco or to Los Angeles.   But the
Southern Pacific, a holding company of the State of Kentucky,
through lease operated the lines of the Central Pacific and
owned its stock.   Thereby was included a line some 800 miles
in length from San Francisco to Ogden, where it connected
with the Union Pacific and the Denver and Rio Grande Rail-
road Company.   The Central Pacific also had branches some
500 miles in length.   The acquisition of the Central Pacific
line from Ogden to San Francisco would give the Union
Pacific a direct line from the Missouri river to San Francisco,
which was much shorter than the line via Portland to San
Francisco.   It is noticed that the opinion permitted the pre-
sentation of a plan for acquiring the control of the direct route
from Ogden to San Francisco.   Therefore, that line did not
fall within the range of the condemnation.   But the Southern
Pacific Company owned a ship line from New York to New
Orleans, where, as well as at Galveston, connection was made
with the company's railway extending through Louisiana,
Texas, New Mexico, Arizona, California and Oregon to Port-
land, reaching Los Angeles and San Francisco.   The United
States asserted that before the purchase of the stock, the Union
Pacific and Southern Pacific competed for interstate commerce,
of which there was much evidence, and that thereafter com-
petition was eliminated.   The strife was for transcontinental
business.   The charges against the combination can be gathered
from the vivid and copious denunciation in the petition.   It
is said in the opinion: "We think the testimony amply shows
that, while these roads did a great deal of business for
which they did not compete and that the competitive business
was a comparatively small part of the sum total of all traf-
fic, State and interstate, carried over them, nevertheless
such competing traffic was large in volume, amounting to
many millions of dollars.   Before the transfer of the stock
this traffic was the subject of active competition between these

systems, but by reason of the power arising from such transfer it has since been placed under a common control. It was by no means a negligible part, but a large and valuable part, of interstate commerce which was thus directly affected. The fact that the Southern Pacific had a road of its own from the gulf to the Pacific coast did not prevent competition for this traffic. The Union Pacific and its connections were engaged in the same carrying trade, and as a matter of fact were competing for that trade, by all the usual means of competition resorted to by rival railroad systems. As this court said, speaking by Mr. Justice HOLMES, in *Swift & Co.* v. *United States* [196 U. S. 398]: ' Commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business.' That commerce, as conducted from the East to the Pacific Coast, was in a substantial part the subject-matter of rivalry and competition between these two systems. Since the stock transfer the companies have common officers and the rival soliciting agencies have been for the most part abandoned."
The decision illustrates that the question was not one of parallelity of lines, but of suppression of competition between common eastern and western terminals. The competition does not seem to have been at points between terminals, but between the terminals themselves — New York and the points on the Pacific coast. What influence the water route had upon all-rail routes the case, as reported, does not show. But what is quite apparent is that each company had a system, and that the union of the two systems did not blend what would coalesce in ordinary and natural development, but rather two incongruous and antagonistic entities, characteristically competitive and coalescing only through compulsion. But as applied to the case at bar, the Union Pacific decision teaches this, that at Granger the Union Pacific could bifurcate and send a branch to San Francisco via Portland, and another line to San Francisco via Ogden, and the Supreme Court saw no fault in it. In the light of such permission, what should be said of the New York Central at Buffalo branching to the north and towards the south, sending off two great lines, which separated in varied directions to many terminals, with some of them converging at Chicago? And there is also this to

be said, that such arrangement of lines was a growth begun long since, tried through many years, and not a sudden arbitrary, conventional, unnatural, amalgamation of two diverse and inharmonious systems. It was the normal sequence of legitimate extension and expansion in necessary progress. It may be said that the concession to the Union Pacific accorded with the intention of the Pacific Railroad Acts, authorizing the consolidation of the Union Pacific and Central Pacific. That would indicate that legal authority to do an act was not disturbed by the anti-trust statute, and bears favorably upon the contention that such act does not affect the control of the Lake Shore, and Michigan Central, by the New York Central and Hudson River Railroad Company. The several phases of this litigation yet to be considered preclude further discussion of authorities at this point, but I consider that this survey justifies the conclusion that the combination does not offend the Federal anti-trust statutes. The anti-trust acts seem to have been enforced with a moral sanity. The language has not been pushed to such extremity as to make the law destructive of relations that have developed by a kind of practical and useful growth.

### COMBINATION THROUGH STOCK OWNERSHIP.

The question has arisen whether a combination through stock ownership could be such as the Federal statute contemplates. The cases already considered amply show that. (See, also, *Steele* v. *United Fruit Co.*, 190 Fed. Rep. 631.)

### MAY PLAINTIFF SUE UNDER THE FEDERAL ACTS?

This consideration is kept apart from that of a stockholder seeking to restrain *ultra vires* or fraudulent acts which will be noticed later. That the plaintiff is not authorized by the Sherman Act to file the present bill, accords with the general course of Federal decision. (*National Fireproofing Co.* v. *Mason Builders' Assn.*, 169 Fed. Rep. [C. C. A. 2d Cir.] 259, 263; *Fleitmann* v. *United Gas Improvement Co.*, 211 id. [C. C. A. 2d Cir.] 103; *Blindell* v. *Hagan*, 54 id. 40; affd., *sub nom. Hagan* v. *Blindell*, 56 id. 696, but an injunction *pendente lite* was granted on other grounds; *Pidcock* v.

*Harrington*, 64 id. 821; *Greer, Mills & Co.* v. *Stoller*, 77 id. 1; *Gulf, C. & S. F. Ry. Co.* v. *Miami S. S. Co.*, 86 id. 407, 420; *Southern Indiana Express Co.* v. *United States Express Co.*, 88 id. 659, 663.) The plaintiff may not maintain the bill under the Clayton Act (1) because he has not proved damage as required by that act; (2) because by his long participation in the enjoyment of the stockholding by the former New York Central Company he is precluded from alleging that it was illegal under either Federal acts or the law of any State; (3) because the Clayton Act does not authorize him to file a bill to divest property acquired before it went into effect, and as to some of the stock before the Sherman Act was passed. The last two grounds will be discussed in other connection, but instantly I consider the failure of the plaintiff to show special damage. The Clayton Act, section 16, provides: "That any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections two, three, seven and eight of this act, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue." (38 U. S. Stat. at Large, 737, chap. 323, § 16.) What loss or damage has the consolidation caused, or what did it, or does it, threaten to cause plaintiff as a stockholder in the New York Central and Hudson River Railroad Company, or the Lake Shore Company, or the Michigan Central Company, and, if there be damage, conjectural or real, is it peculiar to his relation to any one of the companies, or to all of them? And I search for an answer to the same inquiry respecting the relations of the companies for the many years before the consolidation, and while the plaintiff was a stockholder. By reason of a combination in restraint of trade, in the *Standard Oil* case, and in the *Tobacco* case,

varieties of people were shown to have been injured in divers ways. But here a member of corporations alleges that he is injured, and in place of proving actual damages, beyond invoking the expense attending the organization of the new company — an outlay that may be met by increased economies in administration and which in any case goes only to the consolidation — he relies upon a presumption of injury from the wrongful act. So he is merely restraining the combination because it is a crime. But the Clayton Act did not, I infer, tend to allow a private individual to redress a violation of an act merely because it was a violation of public law, but only in case he prove that it "will cause loss or damage." He may have a preliminary injunction, if he show that the "danger of irreparable loss or damage is immediate," but not if he merely show an offense against the United States. The learned counsel for the appellant, in a most thorough brief, among other things cites *Watson* v. *Sutherland* (72 U. S. [5 Wall.] 74) and *North* v. *Peters* (138 id. 271) as presenting instances of irreparable damage. But surely not a shadow of such damage appears here. The violation is, of course, one condition of his right to sue, but that is only preliminary to proof of an injury that distinguishes him from the mass of people. The plaintiff would construe the act to authorize his interposition to vindicate public justice, upon the presumption that a crime hurts his pocket because he has some financial interest in the wrongdoer. That puts him on an equality with the United States, whose functions he would usurp. When the proposition is, whether a system may continue, which in experience accords with the general public benefit, and which affords, and for a generation has presented, to several States facilities for local and distant transportation, and to the nation opportunities for easy intercourse and interchange, into which the plaintiff entered and wherein he presumptively thrived through a considerable period, and concerning which the nation and several States, having jurisdiction, have been silent in the presence of the apparent prosperity of all concerned, I think that there is no presumption of injury to the plaintiff, which he may redress upon the theory that he has some particular hurt that he cannot prove, but of which he is theoretically sensible. In

*Coquard* v. *Nat. Linseed Oil Co.* (171 Ill. 480, 484) it is said: "Only the State can complain of injury to the public or that public rights are being interfered with, and enforce a forfeiture of defendant's franchise for that reason." Plaintiff adverts to *Harding* v. *American Glucose Co.* (182 Ill. 551, 626), but there the demurrer admitted the injury, and, indeed, by the bill it seemed serious, and the court also gave the stockholder standing as representing the company. But in my judgment the Clayton Act does not enable the stockholder to maintain an action in behalf of the corporation. The general principle that the stockholder must show damage to himself was declared in *Continental Securities Co.* v. *Interborough R. T. Co.* (221 Fed. Rep. 44, affg. 207 id. 467; *Thomas* v. *Musical Mutual Protective Union* (121 N. Y. 45); *Delavan* v. *N. Y., N. H. & H. R. R. Co.* (154 App. Div. 8). That the plaintiff may not maintain the action under the Sherman Act appears from the cases cited, and also *Wilder Mfg. Co.* v. *Corn Products Co.* (236 U. S. 165); and that he may not do so under the Clayton Act without showing damage, was decided in *Union Pacific R. Co.* v. *Frank* (226 Fed. Rep. 906 [1915]), where it is said that the Clayton Act (Act of Congress, Oct. 15, 1914, 38 U. S. Stat. at Large, 737, chap. 323, § 16) would not change the rule that the "right to sue by a private party is only given to obtain injunctive relief against threatened loss or damage," so that, the opinion continues, the "loss or damage   *   *   *   must be shown." In *Shawnee Compress Co.* v. *Anderson* (209 U. S. 423) the action was by stockholders of a company illegally leased to an alleged monopolizing company, but the question of their right to sue was not raised, nor was it decided whether the judgment was based on the Sherman Act. In *Bigelow* v. *Calumet & Hecla Mining Co.* (155 Fed. Rep. 869 [1907]) special damage was alleged and a temporary injunction issued. In *Steele* v. *United Fruit Co.* (190 Fed. Rep. 631) the ability to sue was not questioned.

### JURISDICTION OF THE STATE COURT.

Has the State court jurisdiction to enforce the Federal Anti-Trust Acts? The doubt arises entirely from the language of the Sherman and Clayton Acts and the system of administra-

tion for which they provide.  The Sherman Act is a criminal statute, and its enforcement as such falls to the government that enacted it.  But ordinarily the courts of a State would entertain a civil suit based on a Federal statute.  (*Second Employers' Liability Cases,* 223 U. S. 1; *Claflin* v. *Houseman,* 93 id. 130; *Plaquemines Fruit Co.* v. *Henderson,* 170 id. 514; *Cooke* v. *State National Bank of Boston,* 52 N. Y. 96; *Robinson* v. *National Bank of Newberne,* 81 id. 385; *Cook* v. *Whipple,* 55 id. 150.)  If a Federal statute forbade the consolidation of two railways engaged in interstate commerce, a State court could entertain a cause of action in behalf of one damaged, provided it could gain jurisdiction of the proper parties, even if the Federal courts were given jurisdiction.  The Sherman Act provides (§ 4) that "The several Circuit Courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain such violations," and a procedure is prescribed.  But interstate commerce might well involve persons in widely separated judicial districts, and provision was made (§ 5) that other parties could be brought in by subpœnas served in any district on persons whether or not they reside in the district of the venue, and then by section 6 provision was made for forfeiture of property to the United States, which involves a function peculiar to the Federal courts; and then (§ 7) it was provided that "Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any *Circuit* Court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover three fold the damages by him sustained, and the costs of suit, including reasonable attorney's fee."  (26 U. S. Stat. at Large, 209, § 4; Id. 210, §§ 5-7.)  Similar provisions were made in the act of August 27, 1894, sections 73-77 (28 U. S. Stat. at Large, 570), which relates to importations into the United States pursuant to arrangements in restraint of trade.  There has been

decision in this State that the State courts have not jurisdiction. (*Locker* v. *American Tobacco Co.*, 121 App. Div. 443 [decided in 1907]; *Delavan* v. *N. Y., N. H. & H. R. R. Co.*, 154 id. 22 [decided in 1912], appeal dismissed by the Court of Appeals with comment that the question was " difficult and interesting," but that the subject-matter had ceased to exist, 216 N. Y. 360, 362.)   Of course the Clayton Act was not in existence, but the rejection of jurisdiction must rest upon the terms of the Sherman Act, with which the Clayton Act is accordant. The question was raised but not decided in *Straus* v. *American Publishers' Assn.* (231 U. S. 222, 237); but the reasoning in *Wilder Mfg. Co.* v. *Corn Products Co.* (236 id. 165, 173–175 [decided after in an action commenced before the Clayton Act]) strongly favors the exclusive jurisdiction of the Federal courts. The plaintiff points out with much force that the Federal Judicial Code, section 256, enumerates the cases where the jurisdiction is limited to the Federal courts, and that this is not one; but I note that the Code does include crimes and offenses cognizable under the authority of the United States, suits for penalties, etc.   (36 U. S. Stat. 1160, 1161, § 256.)   But the final question is whether the Sherman Act by its very terms does limit jurisdiction to the Federal courts.   Before the Clayton Act was passed in 1914 there had been much decision as to the right of a person to sue for injunctive relief.   The Clayton Act (38 U. S. Stat. at Large, 730, chap. 323) found the party with the power doubtful or lacking.   It did two things: (1) Gave him power to sue in equity; (2) provided for bringing the action in the Federal court, which could have been done without permission, as concerns its usual jurisdiction or that given under the Sherman Act.   I would consider that ordinarily under such enablement the person could also sue in the State court.   But the difficulty is that the Sherman Act is the primary anti-trust law and it is the judicial thought that it provides within itself for its enforcement in the Federal court.   It is the duty of this court to abide by the decisions noted, although an opposite conclusion would harmonize with earlier consideration of the jurisdiction of the State courts under other statutes.

NEITHER THE CONSOLIDATION NOR THE PREVIOUS RELATION
OFFENDS THE LAWS OF THE SEVERAL STATES, WHEREIN THE
NEW COMPANY IS INCORPORATED.

The next inquiry is whether the consolidation violates the
laws of New York, Pennsylvania, Ohio, Indiana, Illinois or
Michigan.

*New York.* The appellant limits the discussion to the rela-
tion of the Lake Shore to the Nickel Plate.

*Pennsylvania.* The Constitution of that State (Art. 17, § 4)
is alleged to be violated by the combination of the same two
railroads. (See, also, Penn. Laws of 1907, p. 353, No. 254; 5
Purdon's Digest [13th ed.], 5896, § 83 *et seq.*) Attention is
called to the Laws of Pennsylvania of 1907 (p. 385, No. 281)
prohibiting thereafter certain relation of railway companies to
street passenger railway corporations. (See 5 Purdon's Digest
[13th ed.] 5897, §§ 86–88.) The statute is invoked with reference
to the New York State Railways, in which the former New York
Central had interests, acquired some years prior to the con-
solidation, but whether before or after the Pennsylvania act
does not appear.

*Michigan.* The Constitution of the State of Michigan (Const.
1850, 1870, art. 19-A, § 2; now Const. 1908, art. 12, § 8) pro-
vides: "No railroad corporation shall consolidate its stock, prop-
erty, or franchises with any other railroad corporation owning
a parallel or competing line." The appellant refers also to the
statutes of Michigan that declare similar prohibition. (Mich.
General Railroad Law [Public Acts of 1873, No. 198], art. 2, § 29,
as amd. by Public Acts of 1891, No. 122, and Public Acts of 1899,
No. 266; Comp. Laws Mich., 1897, § 6254; How. Mich. Stat.
[2d ed.] § 6607.) The Michigan case, cited by the appellant
(*Attorney-General ex rel. Wolverine Fish Co.* v. *A. Booth &
Co.,* 143 Mich. 89, which was decided on the pleadings, and
*White Star Line* v. *Star Line,* 141 id. 604, which arose under
the Sherman Act), did not involve either the Constitution or
above statutes, and present quite different facts from those in
the case at bar. The spirit of decision in the courts of Michi-
gan is gathered from the opinion in *Richardson* v. *Buhl* (77
Mich. 632), which depended upon the validity of the organiza-
tion and purpose of the Diamond Match Company of Connecti-

.cut, which the opinion describes as a " scheme by which all .competition in the manufacture of matches was stifled, opposition in the business crushed, and the whole business of the country in that line engrossed by the Diamond Match Company." (P. 660.)   A decision on such a state of facts has no place here.

### Alleged Parallel and Competing Lines in Michigan.

The appellant instances as violation of the law of Michigan (a) the two short lines between Detroit and Toledo, formerly owned severally by the Lake Shore and the Michigan Central, and potentially competing from Detroit to Vienna, Mich.; (b) lines from such short Lake Shore line via Monroe, Mich., to White Pigeon, Mich., and the Michigan Central from Detroit to New Buffalo, near the southwestern border of Michigan; (c) the Big Four line (Cincinnati Northern, from Jackson to Savona, and Lake Erie and Western from Jackson to Muncie), which for a distance are in the State of Michigan.   The lines (a) and (c) have been considered, and the second (b) shows a spur of the Lake Shore running in the same general direction as the Michigan Central at an average divergence of thirty-five miles.

*Indiana.*  That State has no pertinent constitutional provisions, but there are decisions which, as urged, hold that public policy prohibits one railroad company, through stock ownership or otherwise, controlling a parallel or competing line.   I have examined the cases cited, but look in vain for instances resembling the case at bar.   They bear on actions tending to restrict competition and to enhance prices.   In *Board of Commissioners of Tippecanoe Co.* v. *Lafayette, Muncie & Bloomington R. Co.* (50 Ind. 85) it was decided that stockholders could maintain an action to redress an *ultra vires* act, whereby, without statutory authority, a railway line proposed to run from Muncie, Ind., to Bloomington, Ill., was cut at Lafayette, an intermediate point, by another railway, Toledo, Wabash and Western Railway Company, and its part from Lafayette to Muncie turned over to one company, and its western part diverted to the Toledo Company.   The court states the result (p. 113):  " By this means the western division is diverted into the Toledo, Wabash and Western Railway Company, at Lafayette, and thus forms a continuous line of road from Bloomington.

Illinois, to Toledo, Ohio, instead of a continuous line from Bloomington, Illinois, to Muncie, Indiana, as contemplated by the original organization; and the eastern division is left merely a local road between Lafayette and Muncie, without a western connection, and wholly destroyed as a competing line with the Toledo, Wabash and Western Railway Company." It is worth the pains to unravel such facts and to contrast them with those now present, as they demonstrate concrete conditions that invite rational and practical application of the law. *Cleveland, Columbus, Cincinnati & Indianapolis Ry. Co.* v. *Closser* (126 Ind. 348) involved a pooling agreement between carriers and the relation of a shipper to it. The opinion is instructive in indicating what may be regarded as illegal combination. *Indianapolis Union R. Co.* v. *Dohn* (153 Ind. 10) involved the right to allow one transfer company the monopoly of business upon its grounds. *State ex rel. Snyder* v. *Portland Nat. Gas Co.* (153 Ind. 483) relates to a combination of gas companies in the same town. *Eel River R. Co.* v. *State ex rel. Kistler* (155 Ind. 433) treats of the right of a railroad company to lease its line to a competing company, owning a parallel line, under a statute authorizing companies to lease intersecting and continuous lines, and the right to make the lease independent of statute. *Chicago, Indianapolis & Louisville Ry. Co.* v. *Southern Ind. R. Co.* (38 Ind. App. 234) decided that a contract by which one railroad company restricts its right to compete as a condition of laying its tracks across the track of another is void.

### Alleged Lines Parallel and Competing in Indiana.

The appellant's immediate criticism relates to the Nickel Plate, and also that the Lake Erie and Western and the Big Four compete at certain points, and that the Lake Shore controls both. I have already noticed that the Big Four has a line from Cleveland branching at Galion, so that its northerly member passed through Muncie on its way to Indianapolis, where it again divides for St. Louis and Peoria, and that the Lake Erie and Western has a line from Sandusky through Muncie, Tipton (where it crosses its own line from Michigan City to Indianapolis) and Lafayette (where it intersects the

Big Four to Chicago) to Peoria. The two lines converging towards and to Muncie, and again towards and to Peoria, must for a distance serve a common neighborhood, but I have already discussed their larger purposes, which are dissimilar. The grand purpose of the Big Four is to inter-connect Cleveland, Columbus, Springfield, Dayton, Cincinnati, Indianapolis, Terre Haute, St. Louis, Peoria, Cairo, and several of them with Chicago, and of course to make all other connections within its opportunities of transportation. The object of the Lake Erie and Western as regards the route just now under discussion is to connect Sandusky and intermediate points with Peoria, and of course Indianapolis through the intersecting line from Michigan City is included. Inspection of the map shows that the Lake Erie system is largely northerly of the Big Four. In the accomplishment of their several purposes, the lines of the two companies at places become proximate and again diverging. If the sweep of the country visited by the Big Four and the maximum purposes of the two lines are to yield to the fact that they duplicate the facilities of some vicinages, and even some important places, like Indianapolis (via Lake Erie and Western), then as to the question under immediate discussion the appellant has maintained his position. But I have already expressed other view. But the plaintiff takes a portion of the Lake Erie and Western from Brice, near the eastern Indiana border, through Muncie to Lafayette, and states that it would compete with a part of the Big Four (Cleveland to Indianapolis to St. Louis line) between Union City and Lafayette. A through line is thus split to show intrastate fragmentary proximity. The plaintiff's view does not seem correct. In the same way, plaintiff compares the Lake Erie and Western line from Michigan City or Michigan State line, to Indianapolis, and the Big Four line from Benton Harbor, Mich., via Goshen, to Anderson, Ind., disregarding its continuance to Louisville. I have read the testimony of Mr. Rowland in connection with the map, but gather only that the lines begin at different points on Lake Michigan and have no common station at their terminals, which, as given in appellant's brief, are Indianapolis on the Lake Erie and Western, and Anderson on the Big Four. The two lines at

greatest distance are apart sixty-two miles, and the distance from Anderson to Indianapolis is thirty-six miles. The lines run in somewhat the same direction and are otherwise strangers. The fact is that each belongs to its system and the systems have different missions, although they communicate at times.

*Ohio.* The statutes of Ohio authorize railroad companies to consolidate with companies of other States " owning continuous, connected, but not parallel or competing lines" (Ohio General Code 1910, § 9027), and section 8683 of such Code provides: "A private corporation also may purchase, or otherwise acquire, and hold shares of stock in other kindred but not competing private corporations, domestic or foreign. This shall not authorize the formation of a trust or combination for the purpose of restricting trade or competition."

## Lines Criticised.

In this connection the learned counsel for appellant, aside from the Nickel Plate, refers to the two lines of the Toledo and Ohio Central (stock owned by the Lake Shore) from Toledo to Corning and thence southwesterly over the Kanawha and Michigan which I have earlier discussed. The Toledo and Ohio Central is not in the consolidation, and the Lake Shore Company, owning its stock, was neither a parallel nor competing road. I regret the enlargement of this discussion, but deem it important to exhibit what the courts of Ohio have regarded as illegal combination, and for that purpose refer to some cases on which appellant relies. In *State* v. *Vanderbilt* (37 Ohio St. 590) it was decided that a road extending in a southwesterly direction from Cleveland to Springfield could not be *consolidated* with a road from Cincinnati via Hamilton to Dayton, there being a gap of twenty-four miles between the southern terminus of the former and the northern terminus of the latter, because freight and passengers could not be passed continously from one road to the other, and that the statute required that the railways should be " continuously," connected. (See Ohio R. S. § 3379; now Ohio General Code 1910, § 9025.) The interval was filled by leased lines. The opinion shows that the two lines, with their continuations through lease, or other means, " constitute two great arteries of trade,

both commencing on the Ohio river at Cincinnati, meeting at Dayton, and extending thence to Lake Erie, one terminating at Cleveland and the other at Toledo" (p. 642); that for sixty miles they were parallel and near to each other, and that a leading object in making the consolidation was to destroy competition. The opinion describes the competition between Cleveland and Toledo for the Lake traffic, and that should be taken into consideration respecting the several routes, starting from the several points I have already discussed. (See, also, *Hafer* v. *Railroad Co.*, 4 Ohio Dec. 487.) It may be suggested that the holding has some relation to the earlier discussion concerning the Big Four line from Cleveland to Columbus and the Toledo and Ohio Central to that place, but in that regard Columbus was not a terminal, but a mere intermediate point. Essential also to fair consideration are the three cases presented by appellant, all bearing on the same lines of railway: *State ex rel. Attorney-General* v. *Hocking Valley Ry. Co.* (12 Ohio Cir. Ct. [N. S.] 49); *Gould* v. *Railway* (10 Ohio N. P. [N. S.] 313), and *United States* v. *Lake Shore & Michigan Southern Ry. Co.* (203 Fed. Rep. 295). I have heretofore described the Toledo and Ohio Central line, which in two divisions extends from Toledo to Corning, where, continuing with the Kanawha and Michigan, it operates through southern Ohio and into West Virginia. The Hocking Valley Company also owned a line from Toledo to Gallipolis through which the Kanawha and Michigan operated. The object was through various devices — stock ownership, or common management and operation — to unite the three lines in one control. But it was considered that the Hocking Valley was a parallel and competing line with the Toledo and Ohio Central, and also the Kanawha and Michigan, and that a substantial part of the business of the companies was the carriage of coal from southern Ohio and West Virginia. In the first case the Hocking Valley Company controlled the three companies. In the second case the Chesapeake and Ohio appeared as controlling the Hocking Valley, the Lake Shore as controlling the Toledo and Ohio Central line, and each as controlling one-half of the stock of the Kanawha and Michigan, with an understanding that in such control they should act in harmony. Finally, in the last case the

United States was prosecuting, and the effective presentation of events and conditions in the Federal court indicate what the vice was. It should be especially noted that the court left the Lake Shore controlling the Toledo and Ohio Central lines, acquired in 1910 — a relation so strongly condemned by the appellant, although the Lake Shore then in 1912, controlled the Big Four, and had since 1901. Indeed, years have come and gone, statutes have been passed against combinations, widespreading grasp of traffic has been condemned, more limited combinations have been lopped off, as in the case just mentioned, but the system, now assailed by the plaintiff, has found no official accuser.

*Illinois.* The Constitution of Illinois (Art. 11, § 11) is: "No railroad corporation shall consolidate its stock, property or franchises with any other railroad corporation owning a parallel or competing line." General Consolidation Act (Ill. Public Laws of 1871–72, pp. 487, 489, § 8) has this: "Provided, that railroad corporations shall not consolidate their stock, property or franchises with any other railroad corporation owning a parallel or competing line." (See Revised Statutes Illinois [Hurd 1915–1916], p. 652, chap. 32, § 57.) In *East St. Louis Connecting Ry. Co.* v. *Jarvis* (92 Fed. Rep. 735) two belt lines of railway, not competing in respect to some local, but in their principal, business, were, after cutting rates, rented by a lease to avoid loss. It was said: "The prohibition goes to the consolidation or uniting of the stock of two competing roads, or of the franchises of two competing roads, or of the property of two competing roads. The doing of either would create the prohibited monpoly, and either is within the intendment and meaning of the constitutional provision. Nor do we think that there is force in the contention that this union or consolidation was by means of a temporary arrangement, if thereby that is accomplished which is prohibited by the Constitution. If it be lawful, by means of a lease for 10 years, to consolidate and unite the properties of competing lines of railway, we perceive no reason why a lease for 99 years would not be equally valid. We cannot draw the line in that respect between what is permanent and what is temporary. Whatever produces the prohibited result

is obnoxious to the spirit and the letter of the constitutional provision, and is illegal. We must deal with the result accomplished, without regard to the means employed. It cannot be permitted that one may effect a prohibited result by indirection which he may not lawfully accomplish by direct means. We must therefore hold that the leases in question practically effected a consolidation of the properties of two competing lines, and are within the inhibition of the Constitution." The general rule is that the owner of all the capital stock of a corporation does not own the property of the corporation (*Rough* v. *Breitung*, 117 Mich. 48; *Chase* v. *Michigan Telephone Co.*, 121 id. 631; *Humphreys* v. *McKissock*, 140 U. S. 304, 313), and while ownership of the capital stock may with other facts offend anti-trust laws, it does not seem logical to decide that it amounts to consolidation. The appellant urges that the provisions apply to the Lake Shore, the Nickel Plate and the Michigan Central, which pass through some common points. Disregarding as yet the Nickel Plate, I notice the argument that the Lake Erie and Western and Big Four, held in common stock control by the Lake Shore, are parallel and competing lines, because in their course from Peoria severally to Sandusky and Cleveland, they draw towards each other — as is noticeable from the map, their widest divergence in Illinois being the twenty-nine miles between Ambler and Danville, near the eastern border. I think that persons at either place would not naturally go to the other to ship or to travel to Peoria or points on a line twenty-nine miles distant, when they could reach a railway at their door. The value, however, of intercommunication to points on one of the lines, but not common to the two lines, is apparent. However, I prefer the larger consideration, that the eye following the lines of the railway sees at once different purposes of service, and that the common sharing of the trade of some intervening localities as the lines pass on to the same destination is incidental and not prohibited. I have earlier noted the objection to the common ownership by the Lake Shore of the Chicago and Indiana Southern from Zearing, Ill., to South Bend, Ind., and the Peoria-Cleveland line. Here again the plaintiff cuts a line into segments so as to allege parallelity with another in Illinois. The distance

between the Lake Erie and Western and the Chicago and Indiana Southern as they cross the easterly line of Illinois is about seventy-six miles. That does not indicate that the lines are competitive.

### The Former New York Central Did Not Illegally Vote the Stock of the Lake Shore.

It is urged that under the law of Illinois the stock of the Lake Shore could not be cast for the consolidation by the New York Central and Hudson River Railroad Company, because the latter company acquired it illegally about the same time it acquired the ninety per cent of the stock of the Michigan Central, and while the Lake Shore owned the stock of the Nickel Plate. The appellant's argument is that the original New York company could not legally acquire the stock of the Lake Shore, and that plaintiff as a stockholder could restrain the New York company from voting it. In *Dunbar* v. *American Telephone & Telegraph Co.* (224 Ill. 9, 26) the lack of power to purchase the stock of a competing company was not seriously questioned, and that it was done to suppress competition and to create a monopoly was found, at the instance of a minority stockholder, and the voting of the stock restrained. The same case was again before the court in 238 Illinois, 456, 484. It was said in *Louisville & Nashville Railroad* v. *Kentucky* (161 U. S. 677, 698): " Not only is the purchase of stock in another company beyond the power of a railroad corporation in the absence of an express stipulation in the charter, but the purchase of such stock in a rival and competing line is held to be contrary to public policy and void," and that a railroad corporation, unless empowered, cannot directly or impliedly by the Legislature become a controlling stockholder of another company has been decided. (*Pearson* v. *Concord Railroad Corp.*, 62 N. H. 537; *Marble Co.* v. *Harvey*, 92 Tenn. 115.) As to control of one railway by another through lease, see *St. Louis Railroad* v. *Terre Haute Railroad* (145 U. S. 393, 402); *Pennsylvania Co.* v. *St. Louis, Alton, etc., Railroad* (118 id. 290). The New York Central and Hudson River Railroad Company was empowered by the laws of New York (Stock Corp. Law

[Consol. Laws, chap. 59; Laws of 1909, chap. 61], § 52) to acquire the stock of other companies. So there was no disability on the part of the former New York Central, and the Constitution of Illinois had no extraterritorial force. However, if the consolidation violated the laws of Illinois, it was illegal in that State. For a short distance, twenty-two miles I understand, the Lake Shore runs in the State of Illinois and has the common points of South Chicago, Englewood and Chicago. What intrastate business they do, I do not discover.

THE PLAINTIFF IS PRECLUDED FROM ASSERTING THAT THE FORMER NEW YORK CENTRAL ILLEGALLY HELD THE STOCK OF THE COMPANIES, EVEN IF THEY WERE COMPETING.

The former New York Central purchased the stock of the two companies long since, and, owning it, had the power to vote it, for voting it was a quality of ownership. If a court were invoked to declare the purchase in violation of the Constitution of Illinois, what would it do? It would inquire whether the lines by their relation to each other and to their systems were unduly hampered, and if so found, as it could not on the present evidence, it would not and could not rescind the purchase. It could order the stock sold and it could meantime enjoin the voting of it, provided such use of it would tend to offend public law or public policy. But at whose instance would it do that? Certainly not upon the complaint of the plaintiff, who has held stock in the New York Central and Hudson River Railroad Company since 1907, and of the Michigan Central since 1904, and, so far as the brief discloses, waited until 1914 to assert that the New York Central and Hudson River Railroad Company had exceeded its powers in purchasing the stock of the Lake Shore or Michigan Central. It was not, so far as I discover, until the consolidation was pending that he repudiated acts done in 1898, which gave him an indivisible interest in the stock of both companies, and the enjoyment of all the advantages that come from it. Meanwhile, one can but know that stock and securities of the New York Central and Hudson River Railroad Company, and the other companies here involved, have passed through innumerable ownerships, and in the end plaintiff alone would have the stockholding, to which

he is related as stated, declared illegal. He cannot now be heard in a court of equity to accuse a transaction which he has so long apparently approved. I am not writing that *ultra vires,* fraudulent or illegal acts of directors of corporations can never be redressed by a stockholder, if he long delay. Passivity or even somnolence under continued aggression is not in itself a surrender of rights. I fit the rule of laches, acquiescence or ratification, whatever the proper term may be, as declared in *Pollitz* v. *Gould* (202 N. Y. 11), to the conditions before and at the date of the consolidation, which from the time of the Vanderbilt control had existed for over thirty years and become a fundamental status, imbedded in the economy of transportation for the continent, and an underlying element of rights of property and financial security. Its parts were not coerced into relation by dexterity and power in finance, with the intention of so reaching over territory as to impair opportunities of railway service, but to connect eastern and western spaces, and if usual human selfishness was present, it perfected rather than deformed the progress and public advantages of the undertaking. After the consummation had been accepted as a part of the national life, and had not been assailed by clamor or authority, the plaintiff bought into the company that owned the stock of the Lake Shore and of the Michigan Central, while he was owning stock of the Michigan Central itself, and he had his share of control of either company and his proportion of benefit. He owned an indivisible interest in the ninety per cent of the Michigan Central stock, and the Lake Shore stock, held by the former New York Central. (*Pollitz* v. *Gould,* 202 N. Y. 11.) But, after the question of consolidation arose, he came into a court of equity declaring that the relations enduring from times long past were *ab initio* illegal and void, and that each part, that had come by accretion as the wisdom of the period permitted it, should be segregated to its primal state of isolation. The whole business world related to American securities has acted upon the basis of the system as it is, and the public conscience and intelligence that for more than a generation has allowed the arrangement to exist, should allow it to continue. This is not a case where one corpora-

tion, in abnegation of its public functions, relinquishes its franchises to another, like *Central Transportation Co.* v. *Pullman's Car Co.* (139 U. S. 24), or *Holt* v. *California Development Co.* (161 Fed. Rep. 3), or where one company is wasting or pillaging another, and a stockholder of the wronged company brings belated action to avoid an illegal relation, as in *George* v. *Central Railroad & Banking Co.* (101 Ala. 607, 623), where the court said: " As well might it be said that a person who has for a long time, suffered, without objection, continued trespasses upon his property, is obliged, by reason of his silence, to submit to all future trespasses." The plaintiff would not invite the application of that sentence to himself. *State* v. *Railway Co.* (45 S. C. 470) is similar to the one just noted. On the other hand, I refer to *Coquard* v. *Nat. Linseed Oil Co.* (171 Ill. 480), not affected in the present regard by *Harding* v. *American Glucose Co.* (182 id. 551, 626); *Watts's Appeal* (78 Penn. St. 370, 394); *Pollitz* v. *Wabash R. R. Co.* (207 N. Y. 113, 129). In view of the *Pollitz* case I should say that, although in the action at bar the plaintiff does demand damages against the directors, that is based on a transaction which the plaintiff cannot assert to be illegal. Whether, following the principle enunciated in *Pollitz* v. *Wabash R. R. Co.*, the plaintiff is barred by acquiescence or ratification, is immaterial. I think by both. That was deemed an action to recover damages for the corporation, and it was decided that the Statute of Limitations, and not the laches of the stockholder, was the bar. But what damages has any corporation here involved suffered ? Moreover, what action for damages could such corporation itself bring ? The contract by which it purchased the stock is executed and cannot be disturbed. (*Metcalf* v. *American School Furniture Co.*, 122 Fed. Rep. 115, 124.) It could sue directors who bought the stock, but who are they ? It could sue the directors that formed the new company for expending money in doing so. But no damages are shown, as the mere expense of the new corporation is not shown to be a loss. But is there no time of repose ? That consideration transcends all others. Must these long ago stock purchases always be continuing wrongs, if an incoming stockholder so elect ? And may the stockholder abide in contentment until it is his will or caprice to disclaim;

while all others rely and act upon the faith of the company's ownership ?   It was not thought so in *Venner* (this plaintiff) v. *Chicago City Railway Co.* (236 Ill. 349, 367, 368.)   There his conduct was not measured by years, as here, but by months and by prejudicial results.   I deem the origin of the stockholding valid, but if otherwise, a stockholder who, in enjoyment of the ownership, watches and waits for opportunity, which he regards as gainful to disavow it, should not be heard.

### LINES CONSOLIDATED BECAUSE NOT CONNECTING AT THE INSTANT OF CONSOLIDATION.

It is objected that some of the lines consolidated were not connecting lines within the statutory demand of the States. For instance, the statutes of Pennsylvania authorize the consolidation of railways operating within that State or partly within and partly without it, under the authority of that and adjoining States.   (Penn. Laws of 1865, p. 49, No. 35; 4 Purdon's Digest [13th ed.], 3888, § 164 *et seq.*)   The consolidation agreement shows two railways wholly within New York, two railways partly within New York and partly in Pennsylvania, a railway partly in Indiana and partly in Illinois, a railway partly in Ohio and partly in Michigan, two railways wholly in Michigan, and a railway wholly in Ohio.   It is true that a railway wholly within Illinois, Indiana, Michigan or Ohio, or partly within two of such States, does not form a continuous line of railroad situated wholly within the States of Pennsylvania or New York, or partly in both States.   The order in which the companies fused becomes immaterial.   There was a simultaneous consolidation of all the companies (*Patch* v. *Wabash R. R. Co.*, 207 U. S. 277, 284), so that it cannot be said that there was such disconnection of any parts as to make the union defective.   (*Continental Trust Co.* v. *Toledo, St. Louis & Kansas City R. Co.*, 82 Fed. Rep. 642, 653; affd. *sub nom. Toledo, St. L. & K. C. R. Co.* v. *Continental Trust. Co.*, 95 id. 497, 511.)

### THE MAJORITY OF THE DIRECTORS OF THE LAKE SHORE WERE NOT REQUIRED TO BE RESIDENTS OF ILLINOIS.

It is also objected that the Constitution of 1870 (Art 11, § 11) and statutes of Illinois require a majority of the directors

of the former Lake Shore and Michigan Southern Railroad Company to be citizens and residents of that State, and the record shows that only one of thirteen directors was such. The Lake Shore Company was a corporation organized in 1869 in the States of New York, Pennsylvania, Ohio, Indiana, Michigan and Illinois. It has been decided that such provision does. not apply to an interstate corporation organized prior to the amendment to the Constitution of Illinois in 1870. (*Ohio & Mississippi Ry. Co.* v. *People ex rel. Hanna,* 123 Ill. 467.) The matter is not affected by *Venner* v. *Chicago City Ry. Co.* (246 Ill. 170). Decision of the question was declined in *Matter of New York Central & Hudson River Railroad Company* (N. Y. L. J. May 5, 1916; affd., without opinion, 174 App. Div. 868; 219 N. Y. 559).

### Consent of Railroad Commissions.

In this connection should be considered the fact that the consolidation has been permitted in every State but one by the Railroad Commissioners thereof after public hearing at which plaintiff was heard. The Commission of Ohio considered that it was not required to pass on the question. The plaintiff appealed on January 19, 1915, from the decision of the State Public Utilities Commission of Illinois. It is urged that such decision of the several Commissioners is *res adjudicata* upon the question in the. State where it was made. *Paper Co.* v. *Detroit, etc., R. Co.* (175 Mich. 234), cited by appellant, has no bearing on the question, although it quotes sections 46 and 47 of act No. 300 of the Michigan Public Acts of 1909 (3 How. Mich. Stat. [2d ed.] § 6524 *et seq.*; Id. §§ 6569, 6570). Section 46 is: "This act shall not have the effect to release or waive any right of action by the State or by any person for any right, damage, penalty or forfeiture which may have arisen or which may hereafter arise under any law of this State." Public Service Commissions do not exercise judicial functions. (*Mississippi R. R. Commission* v. *Illinois Cent. R. R.,* 203 U. S. 335; *Louisville & Nashville R. R. Co.* v. *Garrett,* 231 id. 298; *Prentis* v. *Atlantic Coast Line,* 211 id. 210.) The consent of the Commission is the consent of the several sovereigns to whom the constituent companies are amenable, so far as the

Commission represents the State and has authority to do the act. The decision is not *res adjudicata* in the sense that it is judicial, but it is final in the sense that through it the State speaks. But there is this limitation upon the determination of the Commissions. They, or even the Legislature, could not permit a consolidation offending the anti-trust laws of the United States, or the Constitution or statutes of the State for which they act. If, then, the law forbade consolidation, which would create a monopoly or an unlawful restraint of trade, the Commissioners could not override it. The Legislature empowering consolidation could repeal existing statutes but not so the Commissions. They must act within the law as they find it. But where a Commission has heard objections and considered questions of fact, its determination should have some value in determining whether the facts show a violation of public law; and when it was done after public hearing and the plaintiff alone objected, the consent indicates to some degree the approval of all concerned.

### CONSOLIDATION MUST BE LEGAL IN EVERY STATE WHERE THE NEW COMPANY IS ORGANIZED.

I have considered the laws of the several States in which the New Company is incorporated, because it must comply with the law of each State. (*People* v. *New York, Chicago & St. L. R. R. Co.,* 129 N. Y. 474, 483; *Pollitz* v. *Wabash R. R. Co.,* 150 App. Div. 709; 167 id. 669; *St. Louis Railroad* v. *Terre Haute Railroad,* 145 U. S. 393, 405; *Attorney-General* v. *New York, N. H. & H. R. R.,* 198 Mass. 413.) This court may inquire whether there has been compliance with the laws of the several States in which the New Company is incorporated. The plaintiff was a stockholder of the former New York Central and Hudson River Railroad Company, a corporation that was organized in, and was amenable to the laws of, this State. By organizing under the laws of other States the New Company has, if the law has been fulfilled, extinguished the subject-matter of the plaintiff's stock. If it has not consolidated legally, it has wrongfully or irregularly taken from the plaintiff his interest in an entity and in its property, and he is entitled to a decree that the new enterprise be conformed to

law, or, if that may not be, that the former status be restored. *De Koven* v. *Lake Shore & M. S. Ry. Company* (216 Fed. Rep. 955, 958) concerns the present consolidation. If the defect arises out of the laws of New York the duty of the court to take jurisdiction is apparent. But it is not different if the New York company has committed the property in which plaintiff has an interest to a corporation that has no right to take it, no power to exist, or perhaps I should say, to operate, from the fact that the laws of another State forbid what it has done and is doing. Admitting, as defendants contend, that in each State the corporation is only that of each State (*Graham* v. *Boston, H. & E. R. Co.*, 14 Fed. Rep. 753; affd., 118 U. S. 161; *Railway Co.* v. *Whitton*, 80 id. 270), this court is not vindicating the laws of a foreign State, but is conserving the property of a person in this State in a corporation owing life and duty to this State. It would be a strange doctrine that a public instrumentality of the State of New York could divest itself of identity, function and public relation to the State by entering into a form and relation that another State, whose jurisdiction it has sought and to which it is amenable, does not tolerate. It is not the plaintiff's function to interfere on that account, but when the illegality divests him of his property, his right to interposition arises.

## THE NICKEL PLATE.

I have deferred decision concerning this line. From Buffalo to Chicago it seems a practical reproduction of the Lake Shore. It was probably intended to be such. Through ownership of stock, the Lake Shore Company has controlled it since 1882. The New Company succeeded to that ownership, but, as stated in the brief, has since disposed of it, in what way does not appear. The glimpse given of its history indicates that it was an insolvent or impoverished line of railway operated without gain to itself and at the expense of the impairment of its own plant, or at the cost of the bond owners — a dangerous or disastrous rival to sound and earning, competing railways, and in the end injurious to the public. Such was the condition of the West Shore railroad; and the State of New York was moved presumably by a wise policy in permitting its acquisi-

tion by the former New York Central, which in my judgment is sufficient authority for its present ownership. The Nickel Plate sharply illustrates a line that opens up no new territory, that makes no call to regions unsupplied by the system to which it belongs, that as a factor in the entirety of ownership has no distinguishing significance. No great river or lake divides it from its nearby fellow in the same system, whereby a distinct and isolated neighborhood could be served. The dissociating influence of rivers and other bodies of water, severing territory, is recognized. The Nickel Plate multiplies the tracks of the Lake Shore and in that regard it may be highly useful. It is easily conceived that the New York Central Company moving goods and men from States to States and entering into international carriage of such magnitude may need for legitimate business all available trackage. I am constrained to the conclusion that the relation should not be disturbed in this action. The former New York Central controlled the Lake Shore; the latter voted the stock of the Nickel Plate. Now the former New York Central votes directly the stock of the Nickel Plate. The actual power of control is not increased, but some facility in exercising it is gained. The same is true of other companies, whose stock the Lake Shore held. The potentiality is practically the same. As to the plaintiff it should be decided that the former New York Central did legally hold the stock of the Lake Shore; that the latter company did lawfully hold the stock of the Nickel Plate; that this consolidation has not added illegality to the ownership. The Constitution of Illinois (Art. 11, § 11), as construed in *East St. Louis Connecting Ry. Co.* v. *Jarvis* (92 Fed. Rep. 735), would not permit the relation, although the Nickel Plate is not merged in the consolidation, but I do not regard the question as open to the plaintiff.

WESTERN TRANSIT COMPANY, NEW YORK STATE REALTY AND TERMINAL COMPANY.

The New York State Realty and Terminal Company was organized by individuals in 1904 at the instance of the executive committee of directors of the New York Central and Hudson River Railroad Company to acquire, manage and dispose of

real property, to erect and construct union railway depots and other railroad buildings, to hold and dispose of stock and bonds, and to issue its securities. I find no similarity to *Schwab* v. *Potter Co.* (194 N. Y. 409). The former New York Central acquired the stock of the Western Transit Company in 1884. The new company is not operating the boats and has contracted to sell them. But I consider that the plaintiff may not question the legality of the holding of the stock of either company for reasons earlier given. The fact that the former New York Central owned the stock of the Realty Company does not preclude it from consolidating with a company that could not hold such stock. If the former New York Central had purchased real estate that under its charter it could not hold, that would not affect its ability to consolidate with another company, also disabled from holding such land. The New York Central as a corporation in New York may own stock. Each company entering into the consolidation is "to be treated as a domestic corporation in each State in reference to the laws of that State relating to its conduct there " (*Attorney-General* v. *New York, N. H. & H. R. R.*, 198 Mass. 413, 420), but "As to its property, contracts and business it is one and indivisible." The Lake Shore, so far as it is a New York corporation, is enabled by its laws to hold stock in other companies. If it has not similar ability under the laws of another State, that does not prevent merger, nor upon consolidation would the corporation as existing in the State of New York be obliged by the courts of that State to sell stock in a company, one of whose functions was to do construction work incident to the operation of a railway. What should be done if such building corporation did acts quite foreign to the business of the railway corporation, need not be considered.

### THE FEDERAL STATUTES BY RETRO-ACTION DO NOT DIVEST PROPERTY INTERESTS.

It is understood that the plaintiff questions the relations already discussed, and also of the former New York Central, and consequently of the New Company, to the New York and Harlem Railroad Company, the West Shore Railway Company and some other corporations. The plaintiff may not

attack such ownership or interest for applicable reasons already considered, and, moreover, because it is not the intention of the Federal acts to subvert titles vested before their passage. I have quoted above the comment in *Pearsall* v. *Great Northern Railway* (161 U. S. 646), and even in the *Standard Oil* case the court took account of acts prior to the passage of the statute only as they reflected upon the subsequent acts, a course followed in *U. S.* v. *E. I. Du Pont de Nemours & Co.* (188 Fed. Rep. 127, 134), a decision that may well be studied, for its contrasts to the case at bar. I note also that in the *Standard Oil* case there was left in the original hands the old potentiality, which was deemed to gain illegal strength only by solidarity of control. In *United States* v. *Freight Association* (166 U. S. 290) the court was not dealing with property long vested in ownership. There were involved acts begun before the incoming of the Federal statute, and pursuant to an agreement from which any party could retire on thirty days' notice, and which the parties dissolved on one day by a resolution of the previous day. It vested no property rights, and was not intended to do so, and its obligation was practically at the will of each member. The court said: "We give to the law no retroactive effect. The agreement in question is a continuing one. The parties to it adopt certain machinery, and agree to certain methods for the purpose of establishing and maintaining in the future reasonable rates for transportation. Assuming such action to have been legal at the time the agreement was first entered into, the continuation of the agreement, after it has been declared to be illegal, becomes a violation of the act. The statute prohibits the continuing or entering into such an agreement for the future, and if the agreement be continued it then becomes a violation of the act." It is clear that the court in the *United States* v. *Freight Association* case deemed the agreement invalid aside from the Federal act. Mr. Justice PECKHAM says: "The general reasons for holding agreements of this nature to be invalid even at common law, on the part of railroad companies are quite strong, if not entirely conclusive." In *Boyd* v. *New York & H. R. Co.* (220 Fed. Rep. 174) the bill was filed to enjoin consolidation of the defendant named and the New

York Central and Hudson River Railroad Company, which held a lease of the Harlem road, made in 1873. The court decided that the plaintiff stockholder could enjoin the consolidation but could not demand the abrogation of the lease, as that would be an usurpation of the duty of the Attorney-General. The learned judge does write that if the lease created a control or unity of competing interests forbidden by the Sherman Act, the fact that the arrangement antedated the statute did not render the act inapplicable, and for this is cited *Louisville & Nashville R. R.* v. *Mottley* (219 U. S. 467). That was said as introductory to the holding that the plaintiff could not maintain such an action. I gather that the action was not brought for that purpose, although it was part of the prayer. In *Louisville & Nashville R. R.* v. *Mottley* (*supra*) Mottley and wife released the company from all damages for personal injury in consideration of free passes to be issued to them yearly during their lives. Later the amendment of the Interstate Commerce Act of June 29, 1906, was passed, which provided that no common carrier should, "directly or indirectly, issue or give any interstate free ticket, free pass, or free transportation for passengers," and made directions for published fares and charges. (34 U. S. Stat. at Large, 584, 585, § 1, amdg. 24 id. 379, § 1;* 34 id. 586, 587, § 2, amdg. 24 id. 380, § 6. See 34 id. 838, Res. No. 47. See, also, 24 id. 379, § 2.) It was decided that the agreement was subject to the power of Congress to enact the law, which forbade the passes to be issued. The theory of the decision is that persons cannot enter into contracts regulative of interstate commerce that would exclude Congress from exercising its constitutional power. The question is not whether Congress could enact that the New York Central and Hudson River railroad should not engage in interstate traffic while it held the controlling stock in the Lake Shore and the Michigan Central, but whether the statute intended to denounce such ownerships, long before acquired. It is not to be assumed that Congress, by the anti-trust laws, intended to strip persons of their property or to divest stockholders of rights incident to ownership. In *De Koven* v. *Lake*

* Also amd. by 35 U. S. Stat. at Large, 60, chap. 143, and 36 id. 544, § 7.
— [REP.

*Shore & M. S. Ry. Co.* (216 Fed. Rep. 955) this consolidation as proposed was involved, and the learned judge, upon a motion for a preliminary injunction, decided that minority stockholders were "not entitled to a preliminary injunction to restrain its consolidation with another company on the alleged ground that it would be illegal as in restraint of competition and in violation of the anti-trust act, where, through ownership of a majority of the stock of one company by the other, they were, and had been for a number of years, as completely under one management and control as though consolidated, and during all such time the United States had acquiesced therein." Since writing the above, has appeared the decision of March 9, 1917, in *United States* v. *Southern Pacific Co.*\* by the Federal court (District of Utah) that under the Sherman Act the United States could not detach the Central Pacific from the Southern Pacific control, acquired before the act was passed.

## THE STATUTE OF LIMITATIONS.

The Statute of Limitations bars any claim that would disturb the relations existing before the consolidation. The following is the chronology of the several acquisitions of control: New York and Harlem in 1873; Western Transit Company in 1884; West Shore in 1885; Nickel Plate in 1882; Lake Shore in 1898; Michigan Central in 1898; New York State Realty and Terminal Company in 1904. The above is aside from the earlier control of the Vanderbilt family of the former New York Central, Michigan Central, and Lake Shore from 1880 or earlier. In New York the action is barred by the ten years' limitation (Code Civ. Proc. § 388), which is applicable to every form of equitable action, the limitation of which is not specially prescribed (*Gilmore* v. *Ham*, 142 N. Y. 1), except "cases of a continuing right," as well as to an action brought by a stockholder in behalf of a corporation to call directors to account for the manner in which they discharged their trust. (*Brinckerhoff* v. *Bostwick*, 99 N. Y. 185.) In the opinion it is said: "This is unquestionably an equitable action, and the plaintiffs stand in the place of the receiver, and if he had prose-

---

\* Since reported in *United States* v. *Southern Pac. Co.* (239 Fed. Rep. 998).— REP.

cuted the action he would have stood in the place of the bank and had the same rights which it would have had if plaintiff. So this action, for the purpose of determining the limitation of time applicable to it, must be governed by the same law which would have been applicable if the action had been brought by the bank. The action is against the directors as trustees to call them to account for the manner in which they discharged their trust, and is one of which courts of equity always have jurisdiction." If the action is barred the title of the former New York Central to the property interests became indefeasible. (*Baker* v. *Oakwood*, 123 N. Y. 16, 26.) That company was primarily amenable to the laws of this State. If the plaintiff seeks the aid of this court in enforcing a remedy he must submit to the limitation which our laws impose. I find no occasion to determine whether the plaintiff would be barred by a Statute of Limitations in any other of the States concerned. However, attention is called to section 12340 of the General Code of Ohio (1910), which is: "Nothing in this chapter contained shall authorize an action against a corporation for forfeiture of charter, unless it be commenced within five years after the act complained of was done or committed; nor shall an action be brought against a corporation for the exercise of a power or franchise under its charter, which it has used and exercised for a term of twenty years." In *State ex rel.* v. *Standard Oil Co.* (49 Ohio St. 137, 185) that statute, as formerly existing, was under consideration. The subject-matter of the action was an agreement, the object of which "was to establish a virtual monopoly of the business of producing petroleum, and of manufacturing, refining and dealing in it and all its products, throughout the entire country, and by which it might not merely control the production, but the price at its pleasure." In the opinion it is said: "All such associations are contrary to the policy of our State and void." It was decided that an action for a forfeiture of the charter must be "commenced within five years after the act complained of was done or committed," but that within twenty years the action could be brought for the exercise of a power for which it had no authority under the laws of the State. The exact words of the opinion (p. 188) are: "Therefore within that time such a proceeding may be brought. The

defendant, as we have shown, in making and entering into the trust agreements, exercised a power for which it had no authority under the laws of this State, and is continuing to perform the agreement on its part." While there is no intention to consider whether an action based on the Federal anti-trust acts is barred, it is thought that the views expressed in *United States* v. *Kissel* (218 U. S. 601) were based upon a state of facts quite remote from that appearing in the action at bar.

It is concluded that there is sufficient basis upon which to grant an additional allowance. The appellant's brief states: "Plaintiff is also damaged by the fact that over $1,500,000 have been taken from the coffers of his Lake Shore Company for the purpose of effecting an illegal consolidation, which money should have been either applied to the business of the corporation or corporations, or divided amongst the stockholders." It seems that the plaintiff should not be allowed to rely upon such proof to sustain a judgment for damages and deny its effectiveness to avoid an additional allowance.

The judgment should be affirmed, with costs, and the order affirmed, without costs.

STAPLETON, MILLS and RICH, JJ., concurred; CARR, J., not voting.

Judgment affirmed, with costs, and order affirmed, without costs.